Argued and submitted June 5, 1992, judgment vacated; remanded for further
proceedings May 12, reconsideration denied September 29, petition for review denied
October 26, 1993 (318 Or 26)

STATE OF OREGON,
*Appellant,*

*v.*

EUGENE W. JOHNSON, JR.,
*Respondent.*

(C-90-09-35322; CA A69301 (Control))

STATE OF OREGON,
*Appellant,*

*v.*

TRACY JOANN JOHNSON,
*Respondent.*

(C-90-09-35323; CA A69302)
(Cases Consolidated)

851 P2d 1160

Jonathan H. Fussner, Assistant Attorney General, Salem, argued the cause for appellant. With him on the brief were Dave Frohnmayer, Attorney General, and Virginia L. Linder, Solicitor General, Salem.

Ernest Warren, Jr., Portland, argued the cause for respondent Eugene W. Johnson. With him on the brief was Walker & Warren, Portland.

William E. Gaar, Portland, argued the cause for respondent Tracy JoAnn Johnson. With him on the brief was Metropolitan Public Defender, Inc., Portland.

Before Rossman, Presiding Judge, and Edmonds and De Muniz, Judges.

De MUNIZ, J.

Rossman, P. J., concurring.

## De MUNIZ, J.

■ Defendants are husband and wife. They were indicted for delivery and possession of a controlled substance. ORS 475.992(1), (4). The evidence that the state intended to offer against them was discovered during two separate searches: one of their motel room and one of their car.[1] The court granted defendants' motions to suppress the evidence found in the motel room on the ground that their consent to search was not voluntary, and the state appeals. ORS 138.060(3). We granted the state's motion to consolidate. ORAP 2.30. We remand for further proceedings.

The chronology of events that led to defendants' consent to search is not in dispute. As part of his routine patrol, Officer Rhodes frequently stopped at local motels to ask the clerks if they had observed any suspicious activity that might be related to drug transactions. At 2:50 one morning, Rhodes stopped at the Cypress Inn in Portland. The night clerk told him about some suspicious activity related to room 110.[2] Tracy Teixeira was listed as the registered guest in that room. Rhodes ran a records check and found that there was an outstanding warrant for Teixeira's arrest. He summoned another officer, Farr, to accompany him and his partner, Mickola, to room 110 to arrest Teixeira.

Rhodes and Mickola went to the door, while Farr watched the window. Rhodes knocked, and Tracy Johnson opened the door. Rhodes asked her if he could come in to speak with her, and she said yes. Rhodes asked her what her name was, and she answered, "Tracy." Rhodes, believing that she was Tracy Teixeira, told her that she was under arrest and handcuffed her. He asked her what her last name was, and she "mumbled something that sounded like Johnson."

As he was handcuffing Tracy, Rhodes saw Eugene Johnson lying on the bed. Eugene was on top of the covers and was fully dressed. One of his hands was underneath the

---

[1] The motel room and the car represent distinct privacy interests, and the state must independently justify the invasions of each of those interests. *State v. Brown*, 110 Or App 604, 609, 825 P2d 282 (1992).

[2] The record does not reflect what the clerk actually saw or what she told Rhodes.

pillow. Rhodes asked Eugene to identify himself, and he did. Rhodes recognized Eugene's name, and he knew that Eugene had been arrested on weapons charges before. Rhodes went over to Eugene, so that he could handcuff him "for officer safety purposes only."

As he approached Eugene, Rhodes smelled an aroma that he associated with methamphetamine. Rhodes handcuffed Eugene and asked him why he smelled like a "meth lab." Eugene said, "I don't know what you're talking about." Rhodes than advised defendants of their *"Miranda* rights." They told him that they understood those rights. Rhodes asked defendants if there were any drugs or guns in the room. They said that, to their knowledge, there were not. Rhodes asked if he could search the room, and defendants consented.

Rhodes searched the room and found half an ounce of methamphetamine and other drug paraphernalia. He found Tracy's identification in her purse. The officers then removed Tracy's handcuffs, and Mickola went with her into the hallway outside the room. Tracy came back and told Eugene that the officers wanted to search their car. According to Rhodes,

> "[Tracy] says that Officer Mickola essentially has asked if it was okay to look in [defendants'] car and [Eugene] responded that he didn't care because they're going to do what they want to anyway."

Rhodes and Mickola searched the car and found a police radio scanner, a heating grill, a fan, some tubing and a bottle of peppermint extract.[3]

The court concluded that Rhodes had probable cause to arrest Tracy because "[s]he matched the description [of Tracy Teixeira in the warrant] close enough," and it therefore concluded that her arrest was lawful. Next, the court concluded that Rhodes unlawfully arrested Eugene by handcuffing him, because he did not have probable cause to believe that Eugene had committed any crime. Finally, the court concluded that defendants' consent to a search of their motel room was invalid, and it granted their motions to suppress.

---

[3] Rhodes testified that methamphetamine manufacturers use peppermint extract to mask the distinctive aroma of the drug.

In granting defendants' motions to suppress, the court framed the issue as follows:

> "[W]hether or not the consents given to the search of the room were valid or invalid. [W]hen there's been illegal police conduct, the evidence obtained will be suppressed if [the] consent was obtained by exploitation of the illegality [or if] the defendant's free will was tainted by the illegal police conduct.

> "The court's required in determining whether those exist to examine the totality of the circumstances. The burden is on the state to prove the voluntary consent by clear and convincing evidence. According to the case law the burden is even greater when the consent is given after illegal police conduct."

The court indicated that it was "not persuaded the state has carried its burden of proof that the consent was a product of the defendants' free will and not obtained by coercion." *State v. Wolfe*, 295 Or 567, 572, 669 P2d 320 (1983); *State ex rel Juv. Dept. v. Fikes*, 116 Or App 618, 624, 842 P2d 807 (1992).

■ The searches were not pursuant to a warrant. Consequently, the state had the burden of proving, by a preponderance of the evidence, that they were lawful. ORS 133.693(4); Or Const, Art I, §§ 9, 12; *State v. Stevens*, 311 Or 119, 137, 806 P2d 92 (1991). Our courts have frequently observed that the state's burden to prove voluntariness is greater if consent follows illegal police conduct. *E.g.*, *State v. Kennedy*, 290 Or 493, 502, 624 P2d 99 (1981); *State v. Jacobus*, 106 Or App 496, 499, 809 P2d 108 (1991), *rev den* 314 Or 176 (1992). That observation does not mean that the state must prove voluntariness by more than a preponderance of the evidence, *e.g.*, by clear and convincing evidence. Rather, it merely reflects that an unlawful arrest is even more coercive than a lawful one.[4] The state thus has a more difficult time in surmounting the preponderance hurdle, because there is already appreciable evidence that weighs against a finding of voluntariness.

■ The state contends that the officers were authorized to arrest Tracy when she told them that her name was Tracy.

---

[4] Every arrest is inherently coercive. *State v. Quinn*, 112 Or App 608, 612, 831 P2d 48, *rev den* 313 Or 627 (1992).

Second, the state contends that handcuffing Eugene was a reasonable measure to ensure officer safety. We reject both of those propositions.

An arrest warrant must

"(2)   Specify the name of the person to be arrested, or if the name is unknown, shall designate the person by any name or description by which the person can be identified with reasonable certainty [and]

"(* * * * *

"(6)   Command any peace officer to *arrest the person for whom the warrant was issued*[.]" ORS 133.140. (Emphasis supplied.)

The warrant commanded the arrest of Tracy Teixeira. It neither commanded nor authorized the arrest of any other person.

The state contends that the officers were authorized to arrest Tracy Johnson, because she "generally matched the physical description shown in police records and said her name was 'Tracy.' " However, the officers' belief that Tracy was the person who was named in the warrant did not authorize them to arrest her. In *Pierson v. Multnomah County*, 301 Or 48, 718 P2d 738 (1986), there was a valid warrant to arrest Ronald Pierson. Multnomah County police officers stopped his identical twin brother, Robert, for a traffic infraction. They believed that Robert was Ronald, and arrested him. Robert sued the county for false imprisonment. In deciding whether the officers' conduct was privileged, the court weighed "the inherent conflict between *persons who are wrongfully arrested* and officers who are charged with the duty to arrest persons under a warrant." 301 Or at 55. (Emphasis supplied.) It is clear that the court considered Robert's arrest unlawful, even though the police may have believed, in good faith, that he was the person named in the warrant.

■      Other than the warrant, the officers had no information that would suggest that Tracy Johnson had committed any crime. Article I, section 9, does not have a "good faith" exception. *See State v. Devine*, 307 Or 341, 345, 768 P2d 913 (1989); *State v. Davis*, 106 Or App 546, 552, 809 P2d 125

(1991). Consequently, the arrest of Tracy Johnson was unlawful. Or Const, Art I, § 9.

■    We do not mean to suggest that the officers had no authority to stop Tracy for a reasonable time to determine her identity. ORS 131.615. However, her detention was unreasonable under the circumstances. Rhodes testified that he did not believe Tracy when she said that her last name was Johnson. Nonetheless, he did not ask her if she had any identification. Instead, he ignored the possibility that she was telling the truth, and he arrested her.

■    After unlawfully arresting Tracy, Rhodes handcuffed Eugene "for officer safety purposes." He then asked defendants if there were any guns or drugs in the motel room and asked for permission to search. Defendants consented. During that search, Rhodes found Tracy's identification, which proved that she had been telling the truth when she said her name was Johnson.

The state contends that handcuffing Eugene did not constitute an arrest. It argues that Eugene was lawfully stopped and that handcuffing him was a reasonable alternative to frisking him. Alternatively, the state contends that handcuffing Eugene was a reasonable procedure to ensure the officers' safety while arresting Tracy. *See State v. Bates*, 304 Or 519, 524, 747 P2d 991 (1987). Before handcuffing Eugene, Rhodes detected the distinct aroma of methamphetamine emanating from Eugene. That aroma was sufficient to arouse a reasonable suspicion that Eugene was either in possession of the drug, or had recently been in a place where it was manufactured. He was authorized to stop Eugene for the purpose of investigating possible violations of ORS 475.992(1) and ORS 475.992(4).[5]

■    Rhodes knew that Eugene had been arrested on weapons charges before, and he saw that Eugene's hand was concealed underneath the pillow on the bed. He reasonably suspected that Eugene was armed and dangerous. The question in this case is whether Rhodes' handcuffing of Eugene was reasonable under the circumstances. *State v. Bates*,

---

[5] The smell alone did not establish that, more likely than not, Eugene had committed either of those crimes. ORS 131.005(11). The state does not contend that Rhodes was authorized to arrest him.

*supra.* We faced a similar set of circumstances in *State v. Morgan,* 106 Or App 138, 806 P2d 713, *rev den* 312 Or 235 (1991). In that case, the police reasonably suspected that the defendant, whom they had lawfully stopped, was armed and dangerous. The officers frisked the defendant, handcuffed him and placed him in their patrol car. We concluded that the defendant had not merely been stopped, but had been arrested. 106 Or App at 142. We reasoned that

> "when a stop is authorized, a restraint that goes beyond the scope of a stop will result in an illegal arrest, if it is not based on probable cause. * * * [O]nce defendant was taken out of [his] car and frisked, any concern about immediate danger dissipated, especially in light of [the officer's] description of defendant as 'polite and cooperative.' " 106 Or App at 141.

The facts in this case are not significantly different from those in *Morgan.* According to Rhodes, the atmosphere was relaxed, "[a]s much as it could be for people that are being taken into custody." Rhodes asked Eugene to take his hand out from underneath the pillow, and Eugene complied. ORS 131.625 authorized Rhodes to frisk Eugene and to take whatever steps were reasonably necessary to remove an object that felt like a weapon. Rhodes did not take those reasonable precautions. Instead, he immediately handcuffed Eugene.

There may be circumstances in which the interests of officer safety could justify handcuffing a dangerous person who refuses to submit to a frisk during a lawful stop. But when an officer fails to follow the procedure outlined in ORS 131.625, and there is no reason to believe that attempting to do so would be futile, then the use of handcuffs exceeds the restraint permitted by the statute. Rhodes' decision to skip the frisk procedure and to immediately handcuff Eugene instead, constituted an unreasonable seizure. Handcuffing Eugene constituted an arrest that was not supported by probable cause. *State v. Morgan, supra,* 106 Or App at 141. That violated ORS 133.005(1), Article I, section 9, and the Fourth Amendment.

In determining whether defendants voluntarily consented to a search of their motel room, the court was required to make inferences about their mental states when they gave their consent. In drawing those inferences, the court was

required to consider the totality of the circumstances and to assess the degree of coerciveness that pervaded the atmosphere in defendants' motel room. The court correctly concluded that the state had the burden of proving that defendants' free will had not been overcome by the events preceding the officer's request to search their motel room. However, in deciding that issue, the court imposed too high a burden on the state, by requiring it to prove that fact by clear and convincing evidence. We have no way of knowing what finding the court would have made if it had applied the correct standard, and we lack authority to make that finding. *Ball v. Gladden*, 250 Or 485, 487, 443 P2d 621 (1968); *State v. Gaunce*, 114 Or App 190, 196, 834 P2d 512, *rev den* 315 Or 271 (1992).

■ Additionally, we cannot review the lawfulness of defendants' consent to a search of their car, because the trial court never made a ruling on that issue. Accordingly, we remand to the trial court with instructions to make a finding, under the proper standard, whether defendants' consent to a search of their motel room and their car was the product of their free will. The court shall restrict its findings to evidence that is contained in the existing record. *See State v. Gaunce, supra,* 114 Or App at 196.

Judgment vacated; remanded for further proceedings not inconsistent with this opinion.

**ROSSMAN, P. J.,** concurring.

Because Oregon does not recognize a good faith exception to the warrant requirement, I am compelled to agree with the majority that the arrest of Tracy was unlawful. Because the trial court applied the wrong burden of proof, I also agree that we must remand for a finding regarding whether defendants' consents to search their motel room and car were voluntary. However, under the circumstances of this case, I believe that handcuffing Eugene was a reasonable step to protect Rhodes and his fellow officers from serious physical injury. Consequently, I do not believe that the cuffing constituted illegal police activity that should be considered in determining whether the consents were voluntary.

The majority, citing *State v. Bates*, 304 Or 519, 747 P2d 991 (1987), properly frames the issue as "whether

Rhodes' action in handcuffing Eugene was reasonable under the circumstances.'' 120 Or App at 157. However, in what appears to me to be a muddled and misdirected analysis, the majority opinion anomalously holds that the handcuffing was unreasonable and, therefore, constituted a seizure in violation of Article I, section 9, because Rhodes failed to adhere to the procedure outlined in ORS 131.625. 120 Or App at 158. Under that reasoning, whenever an officer lawfully encounters a person and reasonably believes that the person poses a threat to the safety of the officer or others, the steps that the officer can take for protection are limited by ORS 131.625. That is simply not the law.

The majority bases it holding on *State v. Morgan*, 106 Or App 138, 806 P2d 713, *rev den* 312 Or 235 (1991). There, the police received a report that someone had taken a person from a car at gunpoint. Defendant, who was driving a car that matched the description of the vehicle in the report, was stopped and ordered to leave the car. He was frisked, handcuffed and placed in a patrol car. After acknowledging that *State v. Bates, supra*, permits an officer to take reasonable steps for his or her own protection, we held that

> "*once defendant was taken out of the car and frisked, any concern about immediate danger dissipated*, especially in light of [the officer's] description of defendant as 'polite and cooperative.' *On these facts*, we find that when defendant was handcuffed and placed in the patrol car, he was arrested within the meaning of ORS 133.005(1)." 106 Or App at 142. (Emphasis supplied.)

The striking factual differences between *Morgan* and this case compel the conclusion that, here, the officers' concern for their safety had not dissipated when Eugene was handcuffed. In *Morgan*, the defendant was removed from his car and placed in a secure area — the back of a patrol car — that was not in immediate proximity to the officers. Eugene, on the other hand, remained in close proximity to the officers within the confines of a small motel room where a weapon could have been hidden and easily retrieved, especially in light of the fact that the officers were primarily focused on arresting Tracy. In addition, unlike the defendant in *Morgan*, Eugene was never frisked for weapons before he was handcuffed. Under the facts of this case, I do not believe that we

can say in good conscience that the officers' concern for their safety had dissipated by the time Eugene was handcuffed.

The primary flaw in the majority's analysis is that it fails to analyze the issues in the correct order. In *State v. Morgan, supra,* we held that the defendant was illegally arrested *only after* we had concluded that the handcuffing was an unreasonable officer safety measure. If we had instead determined that the cuffing was a reasonable safety precaution, then we never would have decided whether the handcuffing amounted to an illegal arrest because police conduct that is justified on the basis of safety concerns *never* constitutes an "unreasonable" search or seizure under Article I, section 9. *State v. Bates, supra,* 304 Or at 524. *See also State v. Redmond,* 114 Or App 197, 834 P2d 516 (1992) (warrantless seizure of weapons from defendant's person upheld as reasonable safety measure); *State v. Kemp/Haworth,* 112 Or App 522, 831 P2d 37 (1992) (warrantless seizure of rifle and search of front passenger area of car were reasonable steps for officer's protection); *State v. Anfield,* 100 Or App 692, 788 P2d 480, aff'd 313 Or 554, 836 P2d 1337 (1992) (warrantless seizure of bag sustained as reasonably necessary to ensure officer's safety); *State v. Schellhorn,* 95 Or App 297, 769 P2d 221 (1989) (warrantless seizure of purse justified as reasonable safety precaution). Consequently, the handcuffing of Eugene is not a "seizure" that offends Article I, section 9, if it is justifiable as a reasonable safety measure.[1] Our initial focus therefore should be on whether the handcuffing was permissible under *State v. Bates, supra.* If it was, then the officers did not violate the constitutional protections embodied in Article I, section 9. If it was not, *only then* do we decide whether the handcuffing amounted to an illegal arrest.

In *State v. Bates, supra,* the Supreme Court held that Article I, section 9, permits a police officer

"to take reasonable steps to protect himself or others if, during the course of a lawful encounter with a citizen, the officer develops a reasonable suspicion, based upon specific

---

[1] I recognize that an arrest or a stop significantly restricts a citizen's liberty and constitutes a "seizure" of the person under the Oregon Constitution. *State v. Gerrish,* 311 Or 506, 510, 815 P2d 1244 (1991). I do not decide, however, whether Eugene was in fact placed under arrest when he was handcuffed.

and articulable facts, that the citizen might pose an immediate threat of serious physical injury to the officer or to others then present." 304 Or at 524. (Emphasis supplied.)

On judicial review, our inquiry is limited to whether the precautions taken were reasonable under the circumstances as they reasonably appeared at the time that the officer's action was taken. 304 Or at 525. *See also State v. Faccio, supra,* 114 Or App 112, 115-16, 834 P2d 485 (1992).

It is indisputable that Rhodes did lawfully encounter Eugene in the motel room. The arrest warrant authorized the officers to arrest Tracy Teixeira. ORS 133.140(2). Because Teixeira was the registered guest in room 110, the officers had probable cause to believe that she was there. *See State v. Jordan,* 288 Or 391, 605 P2d 646, *cert den* 449 US 846 (1980). The officers were authorized to go to that room and arrest her.

It is also incontrovertible that the circumstances confronting Rhodes supported a reasonable suspicion, based on particularized facts, that Eugene might pose an immediate threat of serious physical injury to him and his fellow officers. As the trial court found:

"[Officer Rhodes] was in [the motel] room, he had arrested Mrs. Johnson, there was also another, unsecured person in the room. And though the attendant described it as large, we all know a motel, it was a single room and everybody was in the same space. And [Eugene] had his hand under the pillow. I'm not saying there was anything in and of itself that suggested that [Eugene] was doing anything with his hand, but it certainly raises concern for the officer.

"And in particular this officer had information from a fellow officer, after he concluded what the identity was of [Eugene], to know that [he] had had a prior police contact that involved weapons taken off [him]. So I think [Rhodes] certainly had specific and articulable reasons to be concerned for his safety."

In addition to those observations, I note that the officers were executing a felony drug-possession arrest warrant, which is an inherently highly dangerous operation. Indeed, Rhodes testified at trial that he found weapons on drug arrestees "anywhere from 25 percent of the time to maybe 40 percent of the time." Moreover, as discussed previously, the warrant

was being executed in a motel room where a weapon could have been easily concealed and retrieved by Eugene, especially when the officers' attention was focused on arresting Tracy. I believe that there were specific and articulable facts supporting Rhodes' suspicion that Eugene may have posed an immediate threat to Rhodes and his fellow officers. I would hold that, *in these circumstances*, handcuffing Eugene *was* a reasonable protective measure.

Eugene argues, and the majority seems to agree, that it would have been *more* reasonable to frisk him rather than handcuff him. *Bates*, however, does not require that the officers choose the *most* reasonable alternative; it only requires that the steps taken *are* reasonable under the circumstances. In this case, they were. In any event, as the state points out in its brief, handcuffing a person may have distinct advantages over frisking him:

> "Handcuffing does not involve the officer running his or her hands over the subject's body; thus it may be more palatable when the officer and the subject are of different sexes. A good thorough frisk takes time and, because dangerous hypodermic needles commonly are encountered on drug users, a frisk subjects the officer to the risk of being punctured and infected. Handcuffing, on the other hand, can be done quickly and involves little risk of encountering needles. A suspect, once frisked, remains a threat: He may attack with his hands or — particularly in the confines of a small room where the officers' primary attention is on arresting someone else — he may grab an officer's gun. A handcuffed person is substantially disabled from doing these things."

I recognize that an arrest is a significant invasion of a person's liberty and, as such, constitutes a "seizure" of the person under Article I, section 9. *See State v. Gerrish, supra* n 1. When it appears that such a seizure may have occurred, it is incumbent upon us to ensure that it was permissible. However, once we decide that the deprivation of a citizen's liberty is justifiable as a reasonable officer safety precaution, our inquiry is at an end and any seizure that may have resulted from the officer's conduct will not be found to have violated the Oregon Constitution. Thus, in balancing the individual's right to be free from restraint against the officer's right to take reasonable steps to protect himself and

others in the performance of his duties, Oregon courts come down on the side of the officer. As the Supreme Court noted in *Bates*:

> "[I]t is not [the function of the courts] to uncharitably second-guess an officer's judgment. A police officer in the field frequently must make life or death decisions in a matter of seconds. There may be little or no time in which to weigh the magnitude of a potential safety risk against the intrusiveness of protective measures. An officer must be allowed considerable latitude to take safety precautions in such situations. Our inquiry is therefore limited to whether the precautions taken were reasonable under the circumstances as they reasonably appeared at the time that the decision was made." *State v. Bates, supra*, 304 Or at 524.

Because handcuffing Eugene was a reasonable step to protect Rhodes' and his fellow officers' safety, I conclude that any "seizure" of Eugene that may have occurred was not "unreasonable" within the meaning of Article I, section 9. I believe that the majority has erred in holding to the contrary.