Submitted on record and briefs June 12, 1995, reversed and remanded May 1, petition for review allowed September 3, 1996 (324 Or 176)

STATE OF OREGON,
*Respondent,*

*v.*

MARK CHARLES REINHARDT,
*Appellant.*

(93-03-31450; CA A83750)

916 P2d 313

Jenny Cooke filed the brief for appellant.

Theodore R. Kulongoski, Attorney General, Virginia L. Linder, Solicitor General, and Robert B. Rocklin, Assistant Attorney General, filed the brief for respondent.

Before Riggs, Presiding Judge, and Landau and Leeson, Judges.

LANDAU, J.

Riggs, P. J., dissenting.

## LANDAU, J.

Defendant appeals his conviction for possession of a controlled substance, ORS 475.992, assigning error to the trial court's denial of his motion to suppress. We reverse and remand.

In early 1993, an informant named Bullis told Detective Hennelly of the West Linn Police Department that he had been to a house where a woman named "Tammy" lived. Bullis gave the street name for the house and generally described its location and appearance. Bullis said that Tammy was buying stolen property at her house and that she paid for the stolen property using methamphetamine. Bullis said that on several occasions he had seen, at Tammy's house, both methamphetamine and property that he knew had been stolen. Bullis said that there was a man named "Rick" who would steal property in order to buy drugs at Tammy's house. Bullis also said that he saw at Tammy's house a man named "Troy," who frequented the house in order to trade stolen property for drugs. Bullis told the officer that "he is afraid" of the people at the house, because they are " 'biker type' people" whom he overheard "talking about their recent release from prison." Bullis also said that he had seen "one of the male subjects in the house wearing a handgun in a shoulder holster."

After Hennelly partially corroborated Bullis's information, a magistrate issued a warrant for a search of the house for methamphetamine. Hennelly and about five other officers went to the house to execute the warrant. Immediately upon entry, Hennelly saw defendant standing inside a bedroom doorway located near the living room of the house. Defendant was wearing a black "motorcycle-type" jacket and black boots. Hennelly ordered defendant "on the ground" and told defendant to put his hands behind his back. Defendant did so, and Hennelly then handcuffed him. After defendant was handcuffed, Hennelly did a "very cursory search on the back of his jacket" and then, along with the other officers, searched the house. After a few minutes, another officer assisted the handcuffed defendant to his feet in order to move him out of the way of the officers. As defendant was being

"stood up," an officer saw a "small Ziplock baggie sticking out of his shirt pocket," which contained what appeared to be, and was, methamphetamine. Another officer seized the baggie.

Defendant was charged with possession of a controlled substance. ORS 475.992. He moved to suppress the search of his person "and the seizure of any and all evidence obtained as a result thereof." At the suppression hearing, defendant argued that the affidavit in support of the search warrant was unreliable. The trial court concluded that the affidavit was sufficient.

Defendant also argued that handcuffing him was unlawful. The state argued that that action was justified by the officers' safety concerns. Hennelly testified about the information provided by Bullis and about the execution of the warrant. He said that he was concerned for his safety, because Bullis said that he had earlier seen a man with a gun at the home, that Hennelly was afraid that the people he had seen at the house would "hurt him" and that they were

"biker-type people, and that they were ex-convicts, people on parole, people with a high propensity towards violence."

Hennelly also testified that, based on his experience and training, "violent" criminals go to "prison," that parolees have a "higher stake in losing their freedom" and are likely to react to an officer "[w]ith violence." Hennelly also testified that persons with tattoos are more likely to be associated with outlaw motorcycle gangs and are more likely to have been to prison, both possibilities making it more likely that they are armed. Finally, Hennelly explained that the reason for handcuffing defendant was

"[t]o ensure that we're not harmed, that he doesn't have any weapons secreted either on his person or in the immediate area of the house. We haven't secured the house, we've secured the people. We secure them until we have an opportunity to secure the house and assure us there are no weapons that are going to do any harm in there."

The trial court found that, had the officers not handcuffed defendant, "it is unlikely the officer would have noticed the baggy or discovered the baggy." The trial court

also found that defendant "complied" with the officers' order "to raise his hands, lay on the ground, but not to move." Nevertheless, it concluded that "the police officers in executing the warrant did not exceed the force allowed" and denied the motion. Following a trial to the court, defendant was convicted.

Defendant appeals, assigning error to the trial court's denial of his motion to suppress. Defendant argues that the denial of his motion was erroneous for two reasons. First, he argues, the affidavit in support of the search warrant was constitutionally insufficient, because it failed to establish Bullis's credibility and the reliability of the information he supplied. Second, he argues, because handcuffing him constituted an unlawful seizure, any evidence that resulted from that handcuffing should have been suppressed. Because we agree with defendant on his second argument, we need not address his first.

■     Defendant argues that there was no justification for the police to handcuff him as they conducted their search of the house. To the state's argument that the handcuffing was necessitated by concerns for officer safety, defendant responds that there simply was no basis on which the officers reasonably could have believed that he posed an immediate threat to their safety. The state argues that handcuffing defendant was a permissible seizure justified as a reasonable safety measure. In support of that argument, the state relies on the following facts: (1) Bullis told Hennelly that he saw " 'biker type' people" at the house who "were talking about their recent release from prison"; (2) Hennelly knew from his training and experience that members of "outlaw" motorcycle gangs are often armed and involved with methamphetamine; (3) Hennelly saw that defendant had "extensive tattoos," and that made it "more likely" that he was either a member of a motorcycle gang or had been to prison and was, therefore, "potentially dangerous"; and (4) Bullis told Hennelly that he had seen a man at the house who had a gun in a shoulder holster.

■     In reviewing the trial court's decision, we are bound by its findings of historical fact if they are supported by the record. *State v. Wilson*, 120 Or App 382, 385, 852 P2d 910, *rev*

*den* 317 Or 584 (1993). We review the court's legal conclusions for errors of law. *State v. Lambert*, 134 Or App 148, 151, 894 P2d 1189 (1995).

■       In evaluating the use of force in executing search warrants, both statutory and constitutional limitations come into play. ORS 133.605(1) provides:

> "The executing officer and other officers accompanying and assisting the officer may use the degree of force, short of deadly physical force, against persons, or to effect an entry, or to open containers, as is reasonably necessary for the execution of the search warrant with all practicable safety."

Article I, section 9, of the Oregon Constitution does not prohibit an officer from taking

> "reasonable steps to protect himself or others if, during the course of a lawful encounter with a citizen, the officer develops a reasonable suspicion, based upon specific and articulable facts, that the citizen might pose an immediate threat of serious physical injury to the officer or to others then present."

*State v. Bates*, 304 Or 519, 524, 747 P2d 991 (1987). In evaluating an officer's actions under both the statute and the constitution, our focus is on the reasonableness of the officer's actions in the light of "the circumstances as they reasonably appeared at the time" they were taken. *Id.* at 525.

■       Intuition and generalized fear do not give rise to reasonable suspicion of an immediate threat to the safety of the officers or others present at a search. *State v. Smay*, 118 Or App 31, 34, 845 P2d 1294 (1993); *State v. Matthys*, 106 Or App 276, 282, 808 P2d 94, *rev den* 311 Or 433 (1991); *State v. Houghton*, 91 Or App 71, 75, 754 P2d 13 (1988); *State v. Hicks*, 89 Or App 540, 544, 749 P2d 1221 (1988). The fact that an individual is attired in a black leather jacket and has long hair and a beard is "entitled to no weight" in the analysis. *Bates*, 304 Or at 525. Nor is the fact that an individual is a "hard-core looking type of person," *State v. Faccio*, 114 Or App 112, 116, 834 P2d 485 (1992), or that the individual is feared to be a member of a motorcycle gang. As we said in *State v. Redmond*, 114 Or App 197, 201, 834 P2d 516 (1992),

"perceptions of the stereotypical practices of motorcycle club members is the kind of generalized suspicion that seldom will constitute a reasonable suspicion based on particularized facts."

Rather, there must be specific and articulable facts to justify the officer's conclusion that a particular person presents an immediate threat of harm. *Smay*, 118 Or App at 34.

With the foregoing principles in mind, we turn to the state's asserted justifications for the handcuffing in this case. First, Bullis's report of " 'biker type' people" at the house, who wore "extensive tattoos" is insufficient; that much is clear. *Bates*, 304 Or at 525; *Redmond*, 114 Or App at 201. Second, Hennelly's knowledge, from training and experience, that members of "outlaw" motorcycle gangs are often armed and are frequently involved in the illegal methamphetamine trade is similarly inadequate. Merely that an individual is dressed in a black jacket, wears tattoos and looks like a "biker type," does not give an officer a reasonable basis to believe that the individual is involved in an "outlaw" organization that is engaged in illegal activity. That leaves Bullis's report to Hennelly that, at some unspecified time in the preceding two months, he had seen a man at the house wearing a handgun in a shoulder holster. That fact simply does not provide a basis for the reasonable suspicion that anyone was armed *at the time of the search*. The state points to no evidence that the officers reasonably suspected that any person in the house was carrying a firearm or had ready access to one. In short, the state has identified no basis on which the officers searching the house reasonably feared for their immediate safety.

The state and the dissent contend that such a conclusion cannot be squared with our recent decision in *State v. Barnett*, 132 Or App 520, 888 P2d 1064, *rev den* 321 Or 137 (1995). We disagree. In that case, an informant told officers responsible for executing a search warrant that the *owner* of the house to be searched was "paranoid," had threatened the informant with "bodily harm," kept firearms in the house and that he would use the guns. The officer believed that guns were "readily available" in several locations inside the house. We concluded that that information

"provided the officers with probable cause to believe that [the owner] was armed and dangerous and that guns were readily available in the living room of the house. It was not unreasonable for the officers to fear that, in the confined space of the [owner's] living room, the putative weapons would be readily accessible to any occupant, including a visitor. Consequently, the officers acted swiftly and decisively to minimize the danger by handcuffing [the] defendant, as well as the [owner], before conducting the search."

*Barnett*, 132 Or App at 524.

In this case, there is no evidence that firearms were readily available to any occupant of the house. Likewise, there is no indication that the owner of the house was armed and dangerous. The only indication that any weapon had ever been at the house was Bullis's statement that at some point during the last couple of months, he had seen a person in the house wearing a handgun in a shoulder holster. Bullis did not tell Hennelly when he saw that man, who the man was, or whether the man was an occupant, a frequent visitor or a one-time visitor. That one unidentified person with a handgun had been seen at the house during the last two months does not lead to reasonable suspicion that firearms were "readily available" to defendant at the time the officers executed the search warrant. *Barnett* is inapposite.

Closer to the point is our decision in *State v. Johnson*, 120 Or App 151, 851 P2d 1160, *rev den* 318 Or 26 (1993). In that case, the state argued that handcuffing the defendant was justified by officer safety concerns because the defendant was involved in manufacturing drugs and had, at some unspecified time in the past, been arrested on weapons charges. We held that such generalized concerns were insufficient and did not rise to the level of immediate danger required to justify restraining the defendant. *Id.* at 158. The facts are not materially different in this case, in which the asserted justifications for handcuffing defendant boil down to his suspected involvement in a "biker" organization and the fact that, at some unspecified time in the past several months, someone observed another individual wearing a gun.

We conclude that the facts articulated by the state do not establish that handcuffing defendant was justified by a reasonable belief that he posed an immediate threat to the officers' safety. Accordingly, that action was an unconstitutional seizure and all evidence obtained as a result must be suppressed. The trial court erred in denying defendant's motion to suppress.

Reversed and remanded.

**RIGGS, P. J.,** dissenting.

The trial court found that, after the officers lifted defendant off the floor, "they saw a plastic baggy part way out of a shirt pocket with the substance they believed to be meth." The court then opined:

"The statute in question, [ORS] 133.605, gives the officers permission to use force in executing warrants. It indicates that, short of deadly force, the officers can use the necessary force for the execution of the search warrant with all practicable safety.

"The question is not whether or not the officers could order the defendant to be on the ground or frisk him because clearly the officers could do that.

"But *the question is, did they need to, for safety reasons, handcuff him*. Had that actually not occurred, * * * it is unlikely the officers would have noticed the baggy or discovered the baggy.

"* * * * *

"* * * *The reasons that the officers articulated [as a basis for their safety] concern was that there were weapons. There were people in the house who were associated with violent acts and with weapons, and they were in the process of searching the house.*

"*They wanted to immobilize anyone in the house so that that person would not pose a threat to them. Was that action reasonably necessary to effectuate the execution of the search warrant with practical safety? And the answer is yes.*

"So based on my findings of the facts, and [ORS] 133.605, I do find that the police officers in executing the warrant did not exceed the force allowed by the statute. I

am going to deny the defense's motion." (Emphasis supplied.)

That conclusion is supported by our recent opinion in *State v. Barnett*, 132 Or App 520, 888 P2d 1064, *rev den* 321 Or 137 (1995) (where informant reported that firearms were kept in the house, officer safety concerns justified handcuffing all occupants during execution of search warrant). As the Supreme Court said in *State v. Bates*, 304 Or 519, 524, 747 P2d 991 (1987):

> "[I]t is not our function to uncharitably second-guess an officer's judgment. A police officer in the field frequently must make life-or-death decisions in a matter of seconds. There may be little or no time in which to weigh the magnitude of a potential safety risk against the intrusiveness of protective measures. An officer must be allowed considerable latitude to take safety precautions in such situations."

Because I agree with the trial court's analysis and believe that its conclusion is proper in the light of *Barnett*, I would affirm. Accordingly, I respectfully dissent.