Argued and submitted September 29, 2000, affirmed May 2, 2001

# STATE OF OREGON,
*Respondent,*

*v.*

# TIOAIVA MILILANI MCKINNEY,
*Appellant.*

C9808-36730; A105349

23 P3d 386

Robin A. Jones, Deputy Public Defender, argued the cause for appellant. With her on the brief was David E. Groom, Oregon Public Defender.

Stacey J. Guise, Assistant Attorney General, argued the cause for respondent. With her on the brief were Hardy Myers, Attorney General, and Michael D. Reynolds, Solicitor General.

Before Edmonds, Presiding Judge, and Armstrong* and Kistler, Judges.

KISTLER, J.

---

* Armstrong, J., *vice* Warren, S. J.

**KISTLER, J.**

Defendant was convicted of possessing and delivering cocaine. On appeal, she argues that the trial court erred in denying her motion to suppress. We affirm.

On August 21, 1998, Officers Schilling and Luiz were patrolling the Old Town area of Portland on their bicycles. Schilling testified that the Old Town area, particularly the area around Sixth Avenue and Couch Street, is marked by a "high incidence of hand-to-hand crack cocaine sales." According to Schilling, most people who come to that area to purchase drugs do so "with the express purpose of buying one or two hits of whatever kind of drug that they're using." He explained that such a transaction is "easy, fast, [and] relatively safe for the buyer and the seller, in that it's handled so quickly that [an officer] really ha[s] to pay attention and be right on top of it."

Sales of drugs in Old Town customarily follow the same pattern. The buyer and seller meet, talk briefly, and the seller shows the merchandise to the buyer by displaying it in his or her open palm. Schilling explained:

> "[T]wo or more people are going to meet up. They're going to talk relatively close to each other, within less than an arm's length of each other. There is usually going to be just a short amount of conversation, uh, and then drugs are usually produced to be seen by the buyer. Either they're held in the hand, taken out of a pocket and held in the hand, they're taken out of the mouth, held in the hand, those kind of things. Usually the person that's selling will have the drugs in an open palm or held between their fingers as they're showing the drugs to someone. Buyers typically always want to see the drugs before they purchase them, and likewise, the sellers usually want to see money as well before they are bringing drugs out of their pocket."

Shortly before midnight, Schilling and Luiz decided to ride their bicycles west on Couch Street from Sixth Avenue towards Broadway. As they did so, they saw defendant and two men walking towards them on Couch Street. Defendant was between the two men. "She had her right hand open with palm up, and she was actually showing something that was

in her hand to [one of the two men]. They were walking real slowly." Although Schilling could not see exactly what was in defendant's hand, it was "obvious" to him, based on his knowledge of the way that drugs are typically sold in Old Town, that "what [he] was seeing was in fact drugs being offered for sale[.]"

When they were about 10 to 15 feet away, Schilling and Luiz "started to make a little noise" as they got off of their bicycles. Defendant looked up and saw that they were police officers. At that point, Schilling was about an arm's-length away from defendant. Defendant "closed her hand, made a fist out of the open extended palm that she had previously" and brought her arm down to her side. Schilling explained that, as she made that motion, "I * * * came up and was off my bicycle, and grabbed both of her arms on either side, like this (demonstrating) on each side, and as I did that, she opened her hand and some crack cocaine then fell to the sidewalk."[1] After Schilling recognized that the substance defendant dropped was crack cocaine, he "placed [her] under arrest."

Before trial, defendant moved to suppress the cocaine that the officers discovered. She argued initially that Schilling told her that she was in custody at the moment he grabbed her and that the officers did not have probable cause to arrest her at that point. The trial court disagreed with defendant's version of the facts. It found

"that it was probably close to a minute from the first physical contact that the officer had with the defendant until she was actually placed in handcuffs, that it was not one motion, that he gained control of her while his partner gained control of her two companions, and thereafter and after he had seen what he suspected was crack cocaine, he formally arrested her."

Defendant responded that, if that were the trial court's factual finding, then she "would simply go on the physical restraint saying that that alone is enough" to establish that she was under arrest. Defendant reasoned that the "holding

---

[1] Schilling testified that he took hold of defendant's arms "right about the elbow, maybe just a little above the elbows."

alone seems to suggest * * * that she's been seized, she could not leave, she physically had no ability to leave" and therefore had been arrested. Defendant argued alternatively that, even if Schilling's actions only constituted a stop, he lacked reasonable suspicion to believe that she was engaged in criminal activity.

The trial court ruled that the officers had reasonable suspicion to stop defendant. It also ruled that taking hold of defendant's arms did not convert what was otherwise a stop into an arrest. The court reasoned: "[G]iven that part of what [the officer s]ought to investigate was what was in her hand, * * * his holding of her arms or grabbing of her arms to facilitate that [investigation] did not make that—was not unreasonable in connection with the stop[.]"

On appeal, defendant renews the arguments that she raised below. She argues that the moment Officer Schilling took hold of her arms, he had arrested her. Before addressing that argument, it is important to restate the sequence of events that occurred. The trial court found that "it was a matter of seconds" after Schilling took hold of defendant's arms that she opened her hand and dropped the rock cocaine. Because Schilling had probable cause to arrest defendant at that point, the question that defendant's first argument raises is whether the initial and momentary act of taking hold of her arms constituted an arrest.

■     We explained in *State v. Hasan*, 93 Or App 142, 147, 760 P2d 1377 (1988), that "the distinguishing feature of a stop is that a person's liberty is restrained by either physical force or by a show of authority." (Internal quotations omitted.) We accordingly rejected the notion in *Hasan* that the officer's use of force in that case meant that the officer had exceeded the permissible bounds of a stop.[2] *Id.; see also Terry v. Ohio*, 392 US 1, 32-33, 88 S Ct 1868, 20 L Ed 2d 889 (1968) (Harlan, J., concurring) (the authority to stop necessarily implies the authority to use force to effectuate the stop). The question is not whether the officer has physically touched or restrained the defendant. Rather, the question is whether

_____

[2] In *Hasan*, the officer physically restrained the suspect and moved her, against her will, from her yard down to the police car on the street so that the victim could view her. 93 Or App at 144-45.

the duration of the detention or the intensity of the officer's actions converted what would otherwise be a stop into an arrest. *See* Wayne R. LaFave, 4 *Search and Seizure* § 9.2(d), 35 3d ed (1996).[3]

■ In this case, the two officers were approaching three persons late at night. Defendant closed her fist and brought her hand to her side when she saw the officers come towards her. One of the officers took hold of defendant's arms as she brought them down to her side. The events unfolded quickly. The time for considered reflection was minimal, and Schilling reasonably took action to ensure that what he suspected was evidence of a crime would not disappear. If Schilling had told defendant to stop and not move her arms, there would be no dispute that he had stopped, not arrested, her. When he took hold of her arms momentarily to accomplish the same purpose, he did not convert what would otherwise be a stop into an arrest. We agree with the trial court that, on the facts of this case, Schilling's initial contact with defendant did not constitute a *de facto* arrest. *See State v. Blair/Vanis*, 171 Or App 162, 167, 14 P3d 660 (2000) (the determination whether a seizure constitutes a stop or an arrest requires "a fact-specific inquiry into the totality of the circumstances") (quoting *State v. Holmes*, 311 Or 400, 408, 813 P2d 28 (1991)).[4]

---

[3] LaFave explains that, under the Fourth Amendment:

"The typical stopping for investigation cannot be viewed as anything but a complete restriction on liberty of movement for a time, and if investigation uncovers added facts bringing about an arrest, the early stages of an arrest will not involve any new restraint of significance * * *. A stopping for investigation is not a lesser intrusion, as compared to arrest, because the restriction on movement is incomplete, but rather because it is brief when compared with arrest, which (as emphasized in *Terry*) 'is inevitably accompanied by future interference with the individual's freedom of movement, whether or not trial or conviction ultimately follows.' "

LaFave, 4 *Search and Seizure*, § 9.2(d) at 35 (footnotes omitted). We find LaFave's reasoning persuasive in analyzing this issue under Article I, section 9.

[4] In Oregon, the question typically has been whether an officer who has stopped a suspect may use physical force in the course of the stop. *See State v. Johnson*, 120 Or App 151, 158, 851 P2d 1160, *rev den* 318 Or 26 (1993); *Hasan*, 93 Or App at 147. Although the Oregon courts have not considered the precise issue before us, we note that the trial court's and our resolution of this issue is consistent with both the state authority noted above and federal authority that is more directly on point. *See United States v. Sokolow*, 490 US 1, 5, 7, 109 S Ct 1581, 104 L Ed 2d 1 (1989) (DEA agents stopped the defendant "when they grabbed him by the arm [at the airport] and moved him back onto the sidewalk"); *cf. United States v.*

The remaining question is whether the officers reasonably suspected that defendant was engaged in criminal activity before they stopped her. On that point, defendant argues that the officers only saw her holding her hand open and that "[a]n open hand is not inherently suspicious." Defendant, however, was in what the trial court found was "an area of not only high drug activity, but specifically an extremely high level of dealing of crack cocaine." In that area, crack cocaine is typically sold in small amounts by holding the drugs in the seller's open palm so that the buyer can inspect the merchandise. Defendant was engaged in precisely that behavior, shortly before midnight, as she and her two companions walked towards the center for dealing crack cocaine in Old Town. When defendant looked up and saw the officers approaching, she closed her hand into a fist as if to hide from the officers what she had been displaying to her two companions.

The police officer reasonably suspected that defendant was engaged in selling controlled substances. The Supreme Court recently reaffirmed that an officer's experience and training can give meaning to actions that, to an untrained observer, might seem innocuous. *See State v. Goodman*, 328 Or 318, 328, 975 P2d 458 (1999). Here, the officer's expertise, which the trial court credited, alerted him to the fact that defendant's actions had the earmarks of a drug sale. *Cf. State v. Coffey*, 309 Or 342, 347, 788 P2d 424 (1990) (recognizing that an officer reasonably could credit an unnamed informant because, among other things, the informant had reported that the cocaine was packaged in a manner known by the officer to be frequently used in the sale of cocaine). To be sure, every act of displaying something in one's palm does not give rise to a reasonable suspicion of criminal activity. But defendant's acts occurred shortly before midnight in the heart of an area in which drug transactions are customarily conducted in that manner, and defendant sought to hide what she had in her hand when she saw the officers approach. The timing, the location, and the nature of defendant's furtive response gave the officers

*Zapata*, 18 F3d 971, 977 (1st Cir 1994) (mere physical touching of the defendant in the course of making a stop did not convert it into an arrest).

reasonable suspicion to believe that defendant was engaged in selling controlled substances. *See State v. Martin,* 327 Or 17, 956 P2d 956 (1998). The trial court correctly denied defendant's motion to suppress.

Affirmed.