Argued and submitted March 28, reversed and remanded August 28, 2002

# STATE OF OREGON,
*Respondent,*

*v.*

# PAUL CURTIS SWIBIES,
*Appellant.*

9908-36074; A109556

53 P3d 447

Daniel M. Carroll, Deputy Public Defender, argued the cause for appellant. With him on the brief was David E. Groom, Public Defender.

Daniel J. Casey, Assistant Attorney General, argued the cause for respondent. With him on the brief were Hardy Myers, Attorney General, and Michael D. Reynolds, Solicitor General.

Before Edmonds, Presiding Judge, Deits, Chief Judge, and Kistler, Judge.

KISTLER, J.

**KISTLER, J.**

Defendant appeals from his conviction for possession and delivery of a controlled substance. He assigns error to the denial of his motion to suppress evidence obtained after he was stopped during the execution of a search warrant. We reverse and remand.

Richard Ness was suspected of being an "upper level" cocaine dealer. Oregon State Police officers had made controlled buys from both Ness's home and his business next door. Based on those buys and their surveillance of his home and business, they concluded that "numerous persons were coming and going" to purchase controlled substances from him. As one officer explained, the level of activity at Ness's home and business demonstrated that "there [was] trafficking in narcotics going on."

A joint state and federal task force got a federal warrant to search Ness's home and business. The officers were aware, before they executed the warrant, that Ness had installed surveillance cameras at his home and business. One of the officers explained that surveillance cameras eliminate the element of surprise that favors the police when they execute a search warrant. The ability to see who is approaching gives the occupants of a home time to decide whether they want to flee or "to take up a firearm and defend themselves." One of the federal agents testified that, in his experience, the presence of video surveillance in homes for which the officers have obtained narcotics warrants made it likely that the occupants will have firearms, "which makes for an extremely dangerous situation."

The officers executed the search warrant in the morning. Fourteen officers took part in the search. Ness's "business next door [to the house] * * * was extremely large, and the majority of these officers after the first hour or so were in the business searching[.]" During their search and before defendant arrived, the officers found two kilograms, or approximately $50,000 worth, of cocaine in Ness's kitchen. They also found a shotgun in the closet. The officers did not advertise their presence, and people came to the house while the officers were searching it. One person came to the house

before noon to return videotapes. He explained that, "[t]here were a lot of police officers and there were a lot of people handcuffed, and sitting and not talking and stuff." While the witness was there, one man whom the officers knew came to the house. That man admitted that "he had something on him" and was arrested.

When the police execute a narcotics search warrant, their concern is not limited to the initial entry into the house. One of the officers explained that, in executing a search warrant, officers have to be concerned that someone may be armed not only when the warrant is first being executed but also later while they are conducting the search. He testified:

> "When you have multiple officers in a house and people are doing, some people are doing searches, some people are talking to people, sometimes it can be very difficult to keep track of everything that's going on around the door and in a situation where you have that, if somebody comes in with a firearm, multiple people could be injured or killed."

Defendant came to the house early in the afternoon while the officers were executing the warrant. Officer Blackman explained that, before defendant arrived, there were officers in the entryway of the house dealing with another person. The front door was open but the security glass door was closed. Blackman was watching the other officers and had his back to the door. He looked over his shoulder and realized that defendant's face was "up against the glass [door with his hands cupped] looking in over [Blackman's] back." Defendant saw Blackman looking at him but did not move. Defendant appeared "confused, somewhat dazed or surprised."

Blackman opened the door, came out, and, according to defendant, "said hi, we are conducting a search here, come on in." Blackman took defendant by the arm and "escorted" him inside the house. One of the officers asked defendant if he had any guns, narcotics, or any type of weapons on him. Defendant "appeared extremely nervous. Kind of incoherent to what we were saying, very distracted. He had a real firm grip of a bag in his right hand and he said no, he did not." One of the federal agents testified that,

"in [his] experience, [he has] found that a lot of people that start acting that way, there's a reason why they are acting that way. Whether it's firearms or other illegal substances they are in possession of, there's a reason to be careful in those type[s] of situations."

The agent patted defendant down and felt what he believed was a pocket knife. The object turned out to be an elongated oval container that contained cocaine. The officers asked defendant if he had any other drugs or illegal substances on him. When he said no, they asked for consent to look into his bag. Defendant did not respond, and the officers searched the bag incident to arrest. In the bag, they found two envelopes. One contained a large amount of currency; the other, cocaine.

The state charged defendant with possession and delivery of a controlled substance. Before trial, defendant moved to suppress the evidence gained as a result of the frisk and the search of the bag. He argued that the officers stopped him in violation of the state and federal constitutions when they took hold of him and brought him into the house. Additionally, he claimed that the officers had no basis under the state and federal constitutions to frisk him once they brought him inside the house.

The trial court denied defendant's motion to suppress. The court explained that the primary question was whether the officers were justified in taking defendant inside the home for officer safety purposes. On that point, the court reasoned:

"Sgt. Blackman acted appropriately, legally and constitutionally in pulling defendant inside the home when he knew or reasonably believed each of the following items, which were supported by evidence: (a) a federal magistrate had issued a presumptively valid search warrant for the home; (b) the home was a drug house; (c) illegal drugs and a concealed weapon had been found; (d) other people had been walking up to the house for various purposes; (e) the search in process included both the home and the nearby business; (f) defendant, an unidentified person, had approached the house without anyone noticing; (g) defendant peered through the door, thus observing the search in process; (h) people approaching the door may have been seeking to

enter the home to conduct illegal drug transactions; (i) people who conduct illegal drug transactions often have weapons as tools of the trade; (j) [Blackman] did not know who defendant was or defendant's intent; (k) he needed to find out the identity and intent of defendant; and (l) pulling defendant inside the home where he was subjected to a quick pat-down search was the least intrusive method by which defendant's identity and purpose could be safely ascertained."

The court ruled that, once defendant was inside the house, the patdown and the subsequent search were reasonable given what the officers then observed.

■     On appeal, defendant argues that the officers violated Article I, section 9, of the Oregon Constitution, first when they stopped him and later when they patted him down.[1] On the first point, he argues that officer safety concerns can never justify a stop and that, even if they can, the officers did not have specific and articulable facts that he presented an immediate threat to their safety. Defendant did not argue below that officer safety concerns are not sufficient, in and of themselves, to justify a stop,[2] and we decline to address that unpreserved issue for the first time on appeal. *See State v. Wyatt*, 331 Or 335, 344-45, 15 P3d 22 (2000). Rather, defendant argued that the officers lacked sufficient evidence that he presented an immediate threat to their safety. Defendant renews that argument on appeal, and we turn to it.

■     The state, for its part, does not dispute that Blackman stopped defendant when he took hold of defendant's arm and pulled him into the house, and the state does not argue that Blackman stopped defendant because he reasonably suspected that defendant had committed or was about to commit a crime. Rather, the state relies solely on the

---

[1] Defendant does not argue on appeal that the officers acted unlawfully when they opened the elongated oval container they found in his pocket during the patdown search, nor does he challenge the later search of his bag. Rather, he argues that that evidence should be suppressed as the fruit of either the stop or the frisk.

[2] Before the trial court, defendant argued that the stop was not justified either by a reasonable suspicion that he committed a crime or by officer safety concerns. He did not argue, as he now does, that a stop is justified only if the officer reasonably suspected that he had committed or was about to commit a crime.

officer safety doctrine to justify Blackman's actions. On that point, the court explained in *State v. Bates*, 304 Or 519, 524, 747 P2d 991 (1987):

> "Article I, section 9, of the Oregon Constitution, does not forbid an officer to take reasonable steps to protect himself [or herself] or others, if, during the course of a lawful encounter with a citizen, the officer develops a reasonable suspicion, based upon specific and articulable facts, that the citizen might pose an immediate threat of serious physical injury to the officer or to others then present."

As a rule, generalized concerns about officer safety are not sufficient to justify invading a person's constitutional rights. *State v. Cocke*, 334 Or 1, 10, 45 P3d 109 (2002); *Bates*, 304 Or at 526; *State v. Walker*, 181 Or App 548, 552, 47 P3d 65 (2002). Rather, the state ordinarily must identify something specific about the particular defendant that reasonably gives rise to the concern that he or she might pose an immediate threat of serious physical injury. *Bates*, 304 Or at 526-27.

We have twice considered whether officer safety concerns permit police officers executing a search warrant to seize persons who are present but not named in the warrant. *See State v. Reinhardt*, 140 Or App 557, 916 P2d 313 (1996), *rev dismissed as improvidently allowed* 327 Or 521 (1998); *State v. Barnett*, 132 Or App 520, 888 P2d 1064, *rev den* 321 Or 137 (1995). In *Barnett*, the officers executed a warrant on the Cosgrove residence. 132 Or App at 522. They knew that Cosgrove frequently used methamphetamine and was paranoid. *Id.* They also knew that Cosgrove kept firearms in the house and was likely to use them. *Id.* When the officers executed the warrant, they quickly entered the house, placed Cosgrove, his wife, and the defendant (a visitor) on the floor and handcuffed all of them. *Id.* We explained that "[i]t was not unreasonable for the officers to fear that, in the confined space of the Cosgroves' living room, the putative weapons would be readily accessible to any occupant, including a visitor." *Id.* at 524. We held that officer safety concerns justified handcuffing the defendant even though there was no evidence about the defendant, other than his presence in the Cosgroves' home, to suggest that he would be likely to use any available weapons against the officers. *Id.*

In *Reinhardt*, the officers executed a search warrant at a house in which stolen property was exchanged for meth- amphetamine. 140 Or App at 559. People visiting the house, and perhaps those occupying it, were "biker type people." *Id.* At some point in a two-month period before the warrant was executed, someone was seen in the house carrying a gun. *Id.* at 563. When the officers entered the house to execute the warrant, they saw the defendant standing near the living room wearing a "black 'motorcycle-type' jacket and black boots." *Id.* at 559. The officers ordered the defendant to get on the floor and handcuffed him. *Id.* We declined to assume, based solely on the defendant's clothing, that he was danger- ous. *Id.* at 562-63. We also distinguished *Barnett* on the ground that "there [wa]s no evidence that firearms were readily available to any occupant of the house. Likewise, there is no indication that the owner of the house was armed and dangerous." *Id.* at 564. We noted that the only evidence that firearms might be available to any of the occupants of the house was a statement that someone at some point in the previous two months had been seen with a firearm. *Id.* Given that evidence, we held that the state had failed to present sufficient specific and articulable facts that the defendant might pose an immediate threat of serious physical injury.

██  Read together, *Barnett* and *Reinhardt* stand for the proposition that the degree of specificity required before an officer may take reasonable steps to ensure his or her safety will vary depending on the situation in which the officer finds himself or herself. When, as in *Barnett*, officers enter a resi- dence to execute a search warrant and have reason to believe that some of the occupants may be armed and dangerous, officer safety concerns permit them to handcuff persons who are present but not named in the warrant and detain them long enough to ensure both the officers' and the occupants' safety. *Barnett*, 132 Or App at 524. That is true even though the officers may not be able to identify anything about the persons other than their presence in such a place. *Id.*[3] Con- versely, when the officers do not have reason to believe that

---

[3] Of course, as the court held in *Cocke*, the officer safety doctrine does not per- mit an officer to enter a separate residence without some showing that the persons in that separate residence might pose an immediate threat of serious physical injury to the officers. 334 Or at 9-10.

the occupants are armed and dangerous, something more specific must be shown before officers may handcuff persons whom they find in the house when they enter. *Reinhardt*, 140 Or App at 564-65.[4]

With these principles in mind, we turn to the facts of this case. We note that this case differs from *Barnett* and *Reinhardt* in one critical respect. Both of those cases addressed the officers' entry into a home to execute a search warrant. The act of entering a home (or other building) to execute a warrant presents unique risks for officers—a proposition that finds recognition in Oregon cases discussing when officers need not knock and announce before entering a home to execute a warrant. *See, e.g., State v. Ford*, 310 Or 623, 634-37, 801 P2d 754 (1990) (summarizing earlier cases).[5] When the officers first enter, they often need to act quickly to ensure that the persons who are present do not pose a threat to them. Once the officers are inside and the premises are secure, however, the risks associated with initially entering the house no longer exist. Officers still have legitimate concerns for their safety while they continue to execute the warrant, but, in the absence of specific evidence indicating otherwise, those concerns will ordinarily diminish after the officers have entered the home and secured it.

■ In this case, the officers entered Ness's house in the morning to execute the warrant. Defendant did not arrive until sometime in the afternoon. By that time, the officers had secured control over both the house and the people inside it. The officers were not aware of any unsecured weapons in the house or other comparable circumstances, nor did they have any specific information that the people coming to the

---

[4] In *Reinhardt*, we did not decide whether some lesser form of seizure would have been constitutionally permissible.

[5] The requirement that officers knock and announce has been explained on the ground that it protects "the safety of the officers and the others on the scene against violent consequences of a sudden, unexplained break-in." *State v. Davis*, 295 Or 227, 236, 666 P2d 802 (1983). Conversely, the courts have recognized an exception to that rule when notice will increase rather than decrease the risk of harm that entry poses to the officers. *Ford*, 310 Or at 634-37; *see* Model Code of Pre-Arraignment Procedure 514 (1975). Significantly, as these cases demonstrate, the courts have uniformly recognized that the act of entering a home to execute a warrant places officers at greatest risk.

house would pose a danger to them. The officers' legitimate need to determine who is present and whether those persons pose a risk to them when they first execute a warrant—the concern that drove our opinion in *Barnett*—is absent here.

The second distinction is related to the first. The officers legitimately could infer from Ness's surveillance system and his occupation that he presented a danger to the officers executing the warrant. Not only do surveillance systems give drug dealers an advantage over the officers' seeking entry, but the officers reasonably could have inferred that Ness would use that surveillance system to their disadvantage when they attempted to enter his home. After the officers successfully entered the home, however, any advantage provided by the surveillance system disappeared. More importantly, even though the officers could infer from the surveillance system and Ness's narcotics business that Ness would resort to violence to prevent others from entering his home, those facts say nothing about whether other persons coming to Ness's home would also be likely to resort to violent behavior.

Third, the officers did not identify anything specifically about defendant that suggested that he might present a threat to their safety other than the fact that he came to the front door of Ness's house and was trying to look inside through the glass door. One of the officers testified that the officers' safety concerns are not limited to entering a home. Rather, they continue while the officers execute the warrant because "if somebody comes in with a firearm, multiple people could be injured or killed." However, nothing in this record suggests that defendant had a firearm or any other weapon when he came to Ness's house.

Another officer testified that persons were likely to use firearms against officers when they executed a search warrant and explained that his statement was based on his experience with both narcotics dealers and purchasers. The officer did not say that purchasers generally are likely to carry firearms, nor did he say that purchasers coming to drug houses, such as Ness's, are likely to carry firearms. Beyond that, there is no evidence here that any of the persons who

came to the house after the officers entered was armed, had acted violently, or had threatened the officers' safety.[6] The officer's general reference to purchasers is not sufficient to explain why he had any safety concerns about this defendant. Indeed, defendant could have been coming to Ness's home for legitimate rather than illegitimate reasons.

Officers legitimately will be concerned about persons coming to a house while they are conducting a search. Blackman, however, could have spoken with defendant outside the house without pulling him in. *See United States v. Clay*, 640 F2d 157, 161 (8th Cir 1981). He could have turned defendant away instead of pulling him in if he had some unspecified and unarticulable concern that defendant might be dangerous. *See id.* Blackman, however, did not articulate anything about defendant or the circumstances of the case that required him to pull defendant into the house for officer safety concerns. We do not suggest that officers must take the least intrusive course available to them in order to come within the officer safety doctrine. Rather, we measure their actions by a test of reasonableness. *See Barnett*, 132 Or App at 524. But, on these facts, some more specific evidence that defendant posed a risk of harm to the officers was necessary before they could take hold of him and pull him into the house. *Bates*, 304 Or at 526; *State v. Dyer*, 157 Or App 326, 332-33, 970 P2d 249 (1998). Because the subsequent frisk and search incident to arrest were the product of that unconstitutional act, the evidence the officers found should have been suppressed.

Reversed and remanded.

---

[6] There is also no evidence that anyone who was present when the officers entered the house to execute the warrant had acted violently or threatened the officers' safety.