Submitted December 20, 2007, reversed and remanded November 19, 2008

STATE OF OREGON,
*Plaintiff-Respondent,*

*v.*

LANCE C. HITCHCOCK,
*Defendant-Appellant.*

Yamhill County Circuit Court
CR030978; A129575 (Control)

STATE OF OREGON,
*Plaintiff-Respondent,*

*v.*

CRYSTAL ROSE WINTERS,
*Defendant-Appellant.*

Yamhill County Circuit Court
CR030977; A129576

197 P3d 33

Peter A. Ozanne, Executive Director, Peter Gartlan, Chief Defender, Legal Services Division, and Louis R. Miles, Deputy Public Defender, Office of Public Defense Services, filed the brief for appellant.

Hardy Myers, Attorney General, Mary H. Williams, Solicitor General, and Anna M. Joyce, Assistant Attorney General, filed the brief for respondent.

Before Edmonds, Presiding Judge, and Sercombe, Judge, and Riggs, Senior Judge.

SERCOMBE, J.

## SERCOMBE, J.

Following a denial of their motion to suppress evidence, defendants Hitchcock and Winters pleaded guilty to charges of possession of a controlled substance and frequenting a place where controlled substances are used, kept, or sold. *Former* ORS 475.992(4)(b) (2003), *renumbered as* ORS 475.840(3) (2005); ORS 167.222. Defendants assign error to the denial of their motion to suppress evidence of drugs and drug paraphernalia seized during a search of their bedroom. Defendants argue that Winters was unlawfully detained by police and that her consent to search the bedroom and her incriminating statements resulted from that unlawful detention. Defendants alternatively contend that the consent and inculpatory evidence were obtained under compelling circumstances and without the necessary *Miranda* warnings. For the reasons explained below, we agree that the evidence was gained through the unlawful detention of Winters and should have been suppressed, and, therefore, reverse both defendants' convictions and remand.

We state the facts consistently with the trial court's explicit and implicit findings. *State v. Ehly*, 317 Or 66, 74-75, 854 P2d 421 (1993); *Ball v. Gladden*, 250 Or 485, 487, 443 P2d 621 (1968). In November 2003, McMinnville Police Officer Huber received information that Henson, who had outstanding arrest warrants, was living at a house in Lafayette, Oregon.[1] Huber, who was familiar with the house where Henson was purportedly residing, communicated with the house's owner, Syphers, and obtained his consent to enter the house to arrest Henson. After obtaining that consent, Huber, Detective Desmond, and Yamhill County Sheriff's Deputies Carelle and Wellborn went to the Syphers house to arrest Henson. They arrived at approximately 5:30 p.m. Huber went to the back of the house because he had information that Henson might try to escape through a back window. Desmond, Carelle, and Wellborn traveled down the driveway to the front of the house. They heard noises coming from the garage, investigated, and discovered defendant Hitchcock there. Not knowing who he was, Desmond handcuffed Hitchcock and advised him of his rights.

---

[1] The record does not show the nature of the outstanding arrest warrants.

While Desmond was dealing with Hitchcock, Carelle and Wellborn entered the house. Once inside, they heard voices coming from an area in the house where two bedrooms were located. They went toward those bedrooms with their weapons drawn. The officers found Henson and his girlfriend, VanTienen, inside one of the bedrooms. Henson was immediately taken into custody and handcuffed.

Winters was across the hall in the other bedroom. At some point during Henson's arrest, Winters opened her bedroom door to see what was happening. Carelle observed Winters in the doorway and asked her to come out of the bedroom. Carelle and Wellborn then ordered everyone—Henson, VanTienen, and Winters—to move into the living room. Neither Winters nor VanTienen was frisked or handcuffed. The entire incident, including entering the house and arresting Henson, took approximately one minute.

Henson, VanTienen, and Winters arrived in the living room at the same time that Desmond entered with Hitchcock. All were seated and detained in order to manage any risk to officer safety, to allow the officers to explain their presence, and to wait for transportation to take Henson to the police station. During the time that the occupants of the house were together in the living room, Henson was under arrest and both he and Hitchcock remained handcuffed; neither was free to go. Winters and VanTienen were not placed under arrest or handcuffed. However, the trial court concluded that they were not immediately free to leave the living room.

After the police advised the group about the reason for their presence, they asked Winters and VanTienen to identify themselves. Winters told Carelle her name. Winters was allowed to go into her bedroom to retrieve her identification card; Carelle followed her there. Carelle asked Winters if he could talk to her in her bedroom and she responded, "[t]hat was fine." Carelle shut the bedroom door. Once inside the bedroom, Carelle turned off the television and seated Winters in a chair in the middle of the room. Carelle told Winters that he "was not interested in arresting her or taking her into custody for anything" at that time. However, he informed Winters that he assumed that there

was drug activity going on in the house because of Henson's involvement in drug dealing. Soon after entering the bedroom, Carelle observed a "marijuana pipe" in plain view. He testified:

> "And I just asked her, I said if there is anything in here that at a later time you don't want to get caught with, you don't want to get in trouble over this, I said, what I want to do is just clean the place up, I want to be able to pick up those items. And she said it was okay that I look in the room for things. And then she kind of pointed out in a couple of spots in the room where there would be a pipe or something else like that."

Carelle's search revealed drugs and "drug items." During the search of Winters's bedroom, Carelle did not advise Winters of her right to refuse consent to the search or that he regarded her as "free to go" and not under police control. The bedroom interview lasted 15 to 20 minutes.

After Carelle searched the bedroom, Winters and Carelle returned to the living room. At that point, Winters and Hitchcock asked Carelle what was going to happen next. Carelle advised them that he would make a report of his search and would be submitting it to the local district attorney for review. Thereafter, the state indicted Winters and Hitchcock on the current charges.

Before trial, defendants moved *in limine* to suppress all evidence seized from the warrantless search of their shared bedroom. They argued that, pursuant to ORS 131.615, Article I, section 9, of the Oregon Constitution, and the Fourth Amendment to the United States Constitution, Winters's detention was not justified by officer safety concerns and that Carelle unlawfully exploited that detention to gain Winters's consent to search their bedroom. Additionally, defendants asserted that suppression was required because Carelle did not advise Winters of her *Miranda* rights before he questioned her.

The trial court denied defendants' motion to suppress, stating, in part:

> "I conclude that the initial detention of Ms. Winters was reasonably related to safety or protective sweep considerations. The officers were in the potentially volatile situation

of arresting someone out of a perceived drug house. Others present could have posed a risk to their safety. * * * While it would appear that interaction with defendants went well beyond the period that may have been necessary to secure, wait for transport and remove Mr. Henson, this initial detention was early on, of limited duration, and was not unreasonable under the circumstances. At the point Ms. Winters went into her bedroom, whether at the request of Sgt. Carelle or not, she was no longer detained for officer safety reasons. After drugs and drug paraphernalia were found, detaining Ms. Winters would again appear warranted, at least as a 'stop' based on reasonable belief that criminal drug activity was occurring.

"Ms. Winters was never under arrest or in the kind of compelling circumstances that would require that she be advise[d] of her rights. While the absence of such advi[c]e is a factor in the court's weighing of the voluntariness of the consent, I still conclude that the consent was, 'under the totality of the circumstances,' voluntary. She was not under arrest, she was not frisked or physically restrained, weapons were not out, she was seated in her own house and bedroom, there was no showing of force or threat of force, express or implied. There was no action with regard to Ms. Winters that showed at any time a willingness to override her ability to choose not to consent. She was asked, not told. She was not arrested at that time, consistent with Sgt. Carelle's representation that he would not do so.

"I conclude that Sgt. Carelle <u>did</u> have consent from Ms. Winters to enter the bedroom and subsequent consent to look in places Ms. Winters indicated drugs or drug paraphernalia would be found * * *.

"Ms. Winters further moves to suppress statements based on a failure to precede questioning with advi[c]e of 'Miranda' rights. Ms. Winters was never under arrest that night. While she may not have been free to go at the beginning, she was not in handcuffs and not otherwise physically restrained. There was certainly a show of authority by the police, but it was directed at Mr. Henson and, to a lesser extent, at Mr. Hitchcock. It was not, in any event, of the type or extent as to require 'Miranda' warnings be given to Ms. Winters * * *."

(Emphasis in original; footnote omitted.) Based on that ruling, Winters and Hitchcock entered conditional pleas of

guilty, reserving the right to appeal the trial court's denial of their motion to suppress. This appeal followed.

On appeal, both defendants assign error to the denial of their motion to suppress, again arguing that Winters's consent to search was the product of an unlawful detention and that her statements were made under compelling circumstances. The state contends that the initial detention of defendants was justified on the ground of officer safety; that, after Henson was arrested, Winters was no longer detained and her consent to search was voluntary; and that *Miranda* warnings were not necessary prior to Carelle's interview of Winters.

Review of defendants' unlawful detention claims requires, in the first instance, analysis of three issues: (1) whether Winters was detained unlawfully before and during Carelle's bedroom interview; (2) whether that detention was justified by reasonable suspicion of criminal activity or concerns for officer safety; and (3) whether Winters's consent to search and any seizure of evidence in plain view in the bedroom resulted from exploitation of any unlawful detention.

We begin our discussion with defendants' state law claims. Because we resolve this case on state law grounds, we do not reach defendants' federal constitutional claims. *See State v. Kennedy*, 295 Or 260, 262, 666 P2d 1316 (1983) (questions of state law should be considered and disposed of before reaching federal constitutional claims).

■■ The first question, then, is whether Winters continued to be stopped and seized following her initial detention during the protective sweep of the house.[2] A stop is a temporary restraint of a person's liberty. *State v. Holmes*, 311 Or 400, 406-07, 813 P2d 28 (1991). Under ORS 131.615,[3] and

---

[2] The trial court determined that the initial protective sweep of the home and detention of Winters during that sweep was justified on the basis of officer safety. The correctness of that determination is not necessary to the disposition of the case, and we do not address that issue.

[3] ORS 131.615 provides, in part:

"(1) A peace officer who reasonably suspects that a person has committed or is about to commit a crime may stop the person and, after informing the person that the peace officer is a peace officer, make a reasonable inquiry.

"(2) The detention and inquiry shall be conducted in the vicinity of the stop and for no longer than a reasonable time.

Article I, section 9, of the Oregon Constitution,[4] a stop occurs when "a law enforcement officer intentionally and significantly restricts, interferes with, or otherwise deprives an individual of that individual's liberty or freedom of movement" or "whenever an individual believes that [a restraint on liberty] has occurred and such belief is objectively reasonable in the circumstances."[5] *Id.* at 409-10. Whether a person has been lawfully stopped requires a fact-specific inquiry that examines the totality of the circumstances in the particular case. *Id.* at 408.

■ Under the facts of this case, the trial court concluded that the initial detention of Winters was a stop because she was not "free to go" when she was seated in the living room. We agree. However, the trial court also concluded that, notwithstanding any continued detention of Winters, the evidence was lawfully seized because of her voluntary consent. On that point, we disagree.

Winters was detained with the four other occupants of the house in the living room during the protective sweep of the house and Henson's arrest. Their freedom of movement was restricted by police direction and under a display of force. There is little question that Winters, Hitchcock, and

---

"(3) The inquiry shall be considered reasonable if it is limited to:

"(a) The immediate circumstances that aroused the officer's suspicion;

"(b) Other circumstances arising during the course of the detention and inquiry that give rise to a reasonable suspicion of criminal activity; and

"(c) Ensuring the safety of the officer, the person stopped or other persons present, including an inquiry regarding the presence of weapons.

"(4) The inquiry may include a request for consent to search in relation to the circumstances specified in subsection (3) of this section or to search for items of evidence otherwise subject to search or seizure under ORS 133.535.

"(5) A peace officer making a stop may use the degree of force reasonably necessary to make the stop and ensure the safety of the peace officer, the person stopped or other persons who are present."

[4] Article I, section 9, of the Oregon Constitution provides, in part, that "[n]o law shall violate the right of the people to be secure in their persons, houses, papers, and effects, against unreasonable search, or seizure[.]"

[5] The case law instructs that, in enacting ORS 131.615, the legislature intended to codify judicial interpretations of Article I, section 9, of the Oregon Constitution. Therefore, the analysis of defendants' rights under that statute and the Oregon Constitution is substantially the same. *See State v. Toevs*, 327 Or 525, 534, 964 P2d 1007 (1998) (stating same).

VanTienen were stopped under the first *Holmes* test inasmuch as the law enforcement officers "intentionally and significantly restrict[ed], interfer[ed] with, or otherwise depriv[ed them] of [their] liberty or freedom of movement." *Id.* at 409-10.

We assume that the initial detention of Winters, Hitchcock, and VanTienen was justified for officer safety reasons. *State v. Swibies*, 183 Or App 460, 467-68, 53 P3d 447 (2002) ("When * * * officers enter a residence to execute a search warrant and have reason to believe that some of the occupants may be armed and dangerous, officer safety concerns permit them to handcuff persons who are present but not named in the warrant and detain them long enough to ensure both the officers' and the occupants' safety."). The same holds true in the execution of an arrest warrant. In this case, defendants' detention, incident to the execution of an arrest warrant, was justified only for the period necessary to allay concerns about the safety of the police officers and the occupants of the house. Lacking any evidence of hostility or danger from Winters, Hitchcock, or VanTienen, that period ended when Hensen was arrested and restrained, the house was surveyed, and the occupants were informed of the police purpose in being there.

■ Once the initial justification of a detention of a person by police ends, continued detention requires a separate justification for it to be reasonable under Article I, section 9. We recently noted that principle in the context of traffic stops in *State v. Rodgers,* 219 Or App 366, 182 P3d 309, *rev allowed*, 345 Or 301 (2008). In *Rodgers*, we upheld the suppression of evidence obtained during a consent search of an automobile when the consent was obtained during an unlawful extension of a traffic stop. We observed that, when reasonable suspicion of a traffic infraction exists, " '[a]n officer can lawfully detain a driver * * * for "the time reasonably required to complete a citation and any other documents that must be given to the citizen in connection with the detention.'" *State v. Raney*, 215 Or App 339, 343, 168 P3d 803 (2007), *modified on recons*, 217 Or App 470, 175 P3d 1024 (2008) (quoting *State v. Boatman*, 185 Or App 27, 34, 57 P3d 918 (2002))." *Rodgers*, 219 Or App at 370. We added that

"[q]uestioning that occurs during, or causes, an *extension* of the traffic stop beyond that reasonable time, however, is the functional equivalent of a new restraint of the motorist's liberty, and must be supported by reasonable suspicion that the motorist has engaged in some further criminal activity. Evidence that derives from that questioning is subject to suppression unless the state can prove that the disputed evidence inevitably would have been discovered, was independently discovered through lawful means, or was sufficiently attenuated from the unlawful police conduct. *State v. Hall*, 339 Or 7, 25, 115 P3d 908 (2005)."

*Id.* at 371 (emphasis in original; some citations omitted).

Applying those principles here, the detention of Winters continued after the protective sweep and Henson's arrest and after dissipation of concerns for officer safety. The police continued the questioning of the occupants and asked them for identification. Hitchcock remained handcuffed. Winters was asked if the interrogation could continue in her bedroom. She was not expressly or implicitly advised that she was free to go or that she could refuse to answer any questions. The continued questioning of Winters, both in the living room and in her bedroom, prolonged her detention.

■ That continued detention was not justified by reasonable suspicion of criminal activity. Reasonable suspicion requires a subjective belief by the police officer that the person has committed a crime or is about to commit one, and that belief must be objectively reasonable under the totality of the circumstances. ORS 131.605(5); *State v. Ehret*, 184 Or App 1, 7, 55 P3d 512 (2002). The state makes no claim that Carelle had information that Winters had committed a crime or was about to undertake criminal activity. And, as noted earlier, further detention was not justified because of safety concerns. Thus, Winters's consent to search and the evidence seized in plain view were obtained during her unlawful detention.

Having concluded that Winters's detention was unjustified, we consider the effect of that illegality on the admissibility of the evidence seized from Winters's bedroom. That inquiry is controlled by *State v. Hall*, 339 Or 7, 115 P3d

908 (2005). In *Hall*, the Supreme Court ruled that police officers illegally exploited an investigatory stop of the defendant to gain his consent to search his vehicle. After concluding that the stop of the defendant violated ORS 131.615(1) and Article I, section 9, of the Oregon Constitution, the court considered the admissibility of the evidence seized from the defendant's vehicle. Under *Hall*, illegal police conduct may negate a defendant's consent to a search because the conduct rendered the consent involuntary. *Id.* at 20. That depends on whether, " 'under the totality of the circumstances, the defendant's consent was an act of free will or, instead, resulted from police coercion, either express or implied.' " *Id.* (quoting *State v. Wolfe*, 295 Or 567, 572, 669 P2d 320 (1983)).

◼ Police conduct in violation of Article I, section 9, may also vitiate a defendant's consent to a search because it resulted from the exploitation of the preceding illegality. *Hall*, 339 Or at 21. Pursuant to the exploitation inquiry, for the evidence to be excluded, the defendant must establish the existence of a factual nexus, *i.e.,* the existence of a "but for" relationship between the evidence sought to be suppressed and the unlawful police conduct. *Id.* at 25.

◼◼ After the defendant makes a minimal showing of a factual nexus between the unlawful police conduct and the defendant's consent, then

> "the state has the burden to prove that the defendant's consent was independent of, or only tenuously related to, the unlawful police conduct. Deciding whether the state has satisfied that burden requires a fact-specific inquiry into the totality of the circumstances to determine the nature of the causal connection between the unlawful police conduct and the defendant's consent. A causal connection requiring suppression may exist because the police sought the defendant's consent solely as the result of knowledge of inculpatory evidence obtained from unlawful police conduct. A causal connection requiring suppression also may exist because the unlawful police conduct, even if not overcoming the defendant's free will, significantly affected the defendant's decision to consent. Although determining the existence of such a causal connection requires examination of the specific facts at issue in a particular case, we view several considerations to be relevant to that determination, including (1) the temporal proximity between the unlawful

police conduct and the defendant's consent, (2) the existence of any intervening circumstances, and (3) the presence of any circumstances—such as, for example, a police officer informing the defendant of the right to refuse consent—that mitigated the effect of the unlawful police conduct."

*Hall*, 339 Or at 34-35 (footnote omitted).

In this case, the trial court concluded that there was "no action with regard to Ms. Winters that showed at any time a willingness to over-ride her ability to choose not to consent" and that she voluntarily consented to the questioning and search of her bedroom. In *Hall*, the court recognized that

"even when a defendant's consent is voluntary—that is, when the defendant's free will has not been overcome by police coercion—that consent is insufficient to establish the admissibility of evidence from a warrantless search if the state cannot prove that the consent was independent of, or only tenuously related to, any preceding violation of the defendant's rights under Article I, section 9."

*Id.* at 27. Thus, even though the trial court found that Winters voluntarily consented to the search of her bedroom, that consent is not dispositive. The state must still meet its burden to show that the preceding unlawful police conduct did not "significantly affect[ ] the defendant's decision to consent." *Id.* at 35.

■ For the following reasons, we hold that Winters's consent and the plain view evidence were gained through the exploitation of her unlawful detention. First, Winters established the necessary factual nexus between the evidence sought to be suppressed and her illegal detention: but for the illegal detention of Winters, Carelle would not have asked to interview Winters in her bedroom or for her consent to search that bedroom.

Second, the state has not proved that the evidence obtained in Winters's bedroom is so tenuously related to the prior illegality as to render it admissible. In particular, the time between Winters's detention and her consent to search was minimal, just one to two minutes in duration. There were no intervening or mitigating circumstances. To the contrary, following what unquestionably was a stop, Winters

was never told that she was not under police control, *i.e.*, that she was "free to go," or that she could refuse to give consent to search her bedroom. Considering the totality of the circumstances present at the time Carelle seized evidence from Winters's bedroom, we cannot say that the state has carried its burden of proving that the disputed evidence did not derive from an exploitation of Winters's unlawful detention.

In sum, Winters was seized illegally when the initial detention based on officer safety continued beyond its justification and was transformed into an illegal seizure. Winters's subsequent consent to questioning and a search of her bedroom that led to the seizure of drugs and drug paraphernalia had a factual nexus to that prior conduct, and the state did not show that intervening circumstances severed the causal connection between that unlawful detention and the seizure of the evidence. Thus, the evidence should have been suppressed.

Because we conclude that Winters's detention and subsequent consent to search her bedroom violated her state constitutional rights, we need not consider whether Carelle was required to give Winters *Miranda* warnings before he questioned her.

Reversed and remanded.