Submitted May 28, 2008, reversed and remanded January 21, 2009

## STATE OF OREGON,
*Plaintiff-Respondent,*

*v.*

## EDWIN GENE HAWKINS,
*Defendant-Appellant.*

Lane County Circuit Court
230511779; A132702

201 P3d 239

Peter Gartlan, Chief Defender, and David Ferry, Deputy Public Defender, Office of Public Defense Services, filed the brief for appellant.

Hardy Myers, Attorney General, Mary H. Williams, Solicitor General, and Susan G. Howe, Senior Assistant Attorney General, filed the brief for respondent.

Before Brewer, Chief Judge, and Ortega, Judge, and Carson, Senior Judge.

ORTEGA, J.

## ORTEGA, J.

■　　Following a stipulated facts trial, defendant was convicted of unlawful possession of a controlled substance. *Former* ORS 475.992 (2003), *renumbered as* ORS 475.840 (2005). He appeals, assigning error to the trial court's denial of his motions to suppress evidence discovered during a warrant search of his bedroom and inculpatory statements he made following discovery of that evidence. We are bound by the trial court's findings of historical fact if they are supported by constitutionally sufficient evidence in the record and review the trial court's legal conclusions for errors of law. *State v. Ehly*, 317 Or 66, 74-75, 854 P2d 421 (1993). We agree with the trial court that no constitutional error required suppression of the evidence discovered during the warrant search, but conclude that defendant's statements should have been suppressed. Accordingly, we reverse and remand.

■　　Defendant rented an upstairs bedroom in a house in Springfield. The house belonged to Garcia, who also resided there. One May morning, Springfield Police Officer Molony, assisted by several other officers, executed a search warrant authorizing the search of "the entire house for any means of forgery," including checks and identification.[1] The warrant also directed the officers to arrest Garcia—the suspect in a forgery and identity theft case—and listed Garcia's mother—who also resided in the house—as a person to be searched. The warrant did not mention defendant by name or otherwise.

　　When the officers entered the residence, they immediately encountered Garcia and took him into custody. Molony remained with Garcia while the other officers, for their safety, searched the house for other individuals. Officers found defendant and a companion, Hendricks, in a bedroom. Defendant and Hendricks were handcuffed and taken downstairs where, along with Garcia, they were advised of their *Miranda* rights. Defendant indicated to the officers that he understood those rights.

---

[1] The search warrant was not part of the record before the trial court. However, because defendant did not challenge the warrant's existence, the court could properly rely on the testimony of the officers who executed the warrant to establish its existence. *See State v. Hall*, 166 Or App 348, 357-58, 999 P2d 509 (2000).

A detective, Boring, assisted by the officers, then began to search the residence in accordance with the warrant. Molony and another detective, Rappe, remained with defendant, Garcia, and Hendricks. As part of the search, the officers searched the room in which defendant and Hendricks had been found. They discovered a personal photograph of defendant and his girlfriend, a letter, and a white powdery substance on a mirror in the bedroom closet. Based on his training and experience, Boring believed the substance to be methamphetamine. Boring took the mirror to Rappe, who was cataloguing seized items. Rappe bagged the substance and documented where it had been found. By that time, approximately one hour had passed since defendant and Hendricks had been brought downstairs.

Meanwhile, at some point after defendant, Garcia, and Hendricks were advised of their *Miranda* rights, a conversation began between the detained trio and Rappe. The record does not indicate who initiated the conversation, which Rappe described as "low-key." Following the discovery of the substance, defendant admitted to Rappe—whether spontaneously or in response to questioning is unclear—that the bedroom in which the mirror had been found was his own. Defendant also stated that he owned the mirror and confirmed that the substance was methamphetamine. Defendant further informed Rappe that he had set out the methamphetamine in anticipation of smoking it. By contrast, Hendricks denied ownership of the methamphetamine. A field test confirmed that the substance was methamphetamine.

Defendant was charged with unlawful possession of a controlled substance. Before trial, he moved to suppress evidence of the methamphetamine and his inculpatory statements. At the suppression hearing, defendant contended that the officers' search of his bedroom was illegal because his room was not within the scope of the warrant for the house. Defendant argued that Article I, section 9, of the Oregon Constitution and the Fourth Amendment to the United States Constitution required the officers to obtain a separate

warrant before searching his bedroom.[2] Defendant asserted that there was no reason to believe that the fruits of a third-party's crimes would be found in his bedroom. Defendant based his motion to suppress his inculpatory statements on the theory that he had been unlawfully seized when the officers handcuffed him. Defendant contended that, because his statements were the product of that illegal seizure, the statements had to be suppressed.

The trial court denied both motions. As to defendant's motion to suppress the methamphetamine, the court concluded that, because the officers had a valid search warrant authorizing the search of the house for small and easily concealed items, they were authorized to search all places in the house where such items could be hidden, including defendant's bedroom. As to defendant's motion to suppress his inculpatory statements, the court concluded that defendant had been detained for safety reasons and that that detention was authorized by ORS 133.605(1).[3] The court also found that the statements had been lawfully obtained, explaining that they had been made after defendant had been apprised of his *Miranda* rights, that there was no evidence that the statements had been compelled by threats or promises, and that defendant had freely made the statements.

On appeal, defendant renews the arguments that he made before the trial court. We begin our discussion with

---

[2] Article I, section 9, of the Oregon Constitution provides:

"No law shall violate the right of the people to be secure in their persons, houses, papers, and effects, against unreasonable search, or seizure; and no warrant shall issue but upon probable cause, supported by oath, or affirmation, and particularly describing the place to be searched, and the person or thing to be seized."

The Fourth Amendment to the United States Constitution provides:

"The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and persons or things to be seized."

[3] ORS 133.605(1) provides:

"The executing officer and other officers accompanying and assisting the officer may use the degree of force, short of deadly physical force, against persons, or to effect an entry, or to open containers, as is reasonably necessary for the execution of the search warrant with all practicable safety."

defendant's contention that the officers should have obtained a separate search warrant to lawfully search his bedroom. This court recently considered a similar argument in *State v. Ramirez*, 223 Or App 241, 195 P3d 460 (2008). There, a search warrant authorized the search of the defendant's apartment—which he shared with other persons—for evidence of controlled substances. *Id.* at 244. While speaking with the defendant's roommates, the officers observed methamphetamine, other objects, and behavior that led them to believe that illegal drug activity was occurring at the apartment and used that information to obtain the warrant. *Id.* at 243-44. When the officers executed the warrant, they found evidence of drug activity in the defendant's bedroom. *Id.* at 244. The trial court granted the defendant's motion to suppress that evidence, reasoning that the affidavit was insufficient to establish that the defendant, as opposed to his roommates, was involved in the drug activity. The trial court further held that, because the defendant's bedroom was a separate living unit of the apartment, specific information was required to establish probable cause to search the defendant's bedroom. *Id.* at 245.

On appeal, this court concluded that the trial court erred because the defendant had presented no evidence that his bedroom was "anything other than an ordinary bedroom in a residence." *Id.* at 246; *see also State v. Coatney*, 44 Or App 13, 18, 604 P2d 1269, *rev den*, 289 Or 107 (1980) (the defendant has the burden of proving that a search conducted pursuant to a search warrant was unlawful). We explained that, generally, a search warrant issued for the search of a residential unit authorizes the search of the entire residence unless the residence contains separate units and subunits and emphasized that the mere fact that multiple persons reside in a residence does not automatically convert the residence into a multiple-unit structure. *Ramirez*, 223 Or App at 246. Instead, information about the residence, including its physical structure, whether the doors to different parts of the living unit have locks and are locked, and whether the occupants of the different parts have restricted other persons' access, are pertinent considerations. *Id.*

■ This case is like *Ramirez*. Defendant has not presented any evidence indicating that his bedroom was a separate unit of Garcia's house. There is no evidence that his bedroom door had a separate lock, nor is there any evidence that defendant's bedroom door was even shut as the officers conducted their safety search of the house. Furthermore, defendant has neither provided any evidence that he limited other residents' access to his bedroom, nor any that his room included a kitchen, bathroom, or any other characteristics of a separate living unit. *See State v. Devine*, 307 Or 341, 344, 768 P2d 913 (1989) (describing several characteristics of a separate living unit). Accordingly, Article I, section 9, did not require the officers to obtain a separate warrant to search defendant's bedroom.

■■ We reach a similar conclusion with regard to the Fourth Amendment. A warrant may authorize a search of an entire street address while reciting probable cause as to only a portion of the premises (1) if the premises are occupied in common rather than individually; (2) if a multiunit building is used as a single entity; (3) if the defendant was in control of the whole premises; or (4) if the entire premises are suspect. *United States v. Whitten*, 706 F2d 1000, 1008 (9th Cir 1983), *cert den*, 465 US 1100 (1984). Here, it is apparent that the entire premises were suspect. Garcia owned the house and resided there with his mother, who was also a suspect in the forgery investigation. As noted, the warrant authorized the seizure of various instruments of forgery—such as checks and identification—that are readily concealable. As such, probable cause existed to search the entire residence. Accordingly, the trial court correctly denied defendant's motion to suppress the evidence of methamphetamine found in his bedroom.

We next address defendant's contention that he was seized when officers handcuffed him while executing the search warrant. He asserts that the officers lacked reasonable suspicion to believe that he had committed a crime and that there is no evidence that he presented a threat to the officers' safety. Defendant contends that his inculpatory statements must be suppressed as the product of an unlawful

seizure. The state concedes that the officers lacked reasonable suspicion to believe that defendant had either committed a crime or presented a threat to their safety. Nevertheless, the state argues that, because ORS 133.605(1) authorized the officers to detain defendant as they executed the search warrant, the officers could lawfully handcuff defendant. According to the state, because defendant does not challenge the reasonableness of the force used to detain him, we need only consider whether the officers had authority to detain defendant.

▮▮▮▮ Whether the officers had statutory authority to detain defendant during their execution of the warrant does not answer the question of whether the method of detention—handcuffing—was constitutional. Article I, section 9, allows an officer to take

> "reasonable steps to protect himself or others if, during the course of a lawful encounter with a citizen, the officer develops a reasonable suspicion, based upon specific and articulable facts, that the citizen might pose an immediate threat of serious physical injury to the officer or to others then present."

*State v. Bates*, 304 Or 519, 524, 747 P2d 991 (1987). In evaluating an officer's actions under the constitution, we focus on the reasonableness of those actions in light of "the circumstances as they reasonably appeared at the time" they were taken. *Id*. at 525. We are mindful that, as part of their duties, police officers frequently must make life-or-death decisions in a matter of seconds. In those situations, there "may be little or no time in which to weigh the magnitude of a potential safety risk against the intrusiveness of protective measures." *Id*. at 524. As a result, officers "must be allowed considerable latitude to take safety precautions in such situations" and "it is not our function to uncharitably second-guess an officer's judgment." *Id*. We recognize that the execution of a search warrant is one situation in which officers must be especially vigilant. Nevertheless, intuition and a general concern for safety do not themselves give rise to reasonable suspicion of an immediate threat to the safety of the officers or others present at a search. *State v. Reinhardt*, 140 Or App 557, 562, 916 P2d 313 (1996), *rev dismissed*, 327 Or 521 (1998). There

must be specific and articulable facts to justify an officer's conclusion that a particular person presented an immediate threat of harm. *Id*. at 563.

█ █ After reviewing the record, we agree with, and accept, the state's concession that the officers lacked reasonable suspicion that defendant posed a threat to their safety or that he had committed a crime. When officers execute a search warrant and have reason to believe that at least some of the persons present are armed and dangerous, officer safety concerns permit officers to handcuff and detain all persons who are present, even persons not named in the warrant. *State v. Swibies*, 183 Or App 460, 467, 53 P3d 447 (2002). Conversely, if officers do not have reason to believe that persons present are armed or otherwise dangerous, something more specific must be shown before officers may handcuff persons whom they find while executing the warrant. *Id*. at 467-68. In this case, nothing in the record suggests that the officers possessed information that either Garcia or his mother, let alone defendant, was armed or dangerous. *Cf. State v. Barnett*, 132 Or App 520, 524, 888 P2d 1064, *rev den*, 321 Or 137 (1995) (officers could handcuff a defendant who was not a subject of a warrant because the officers had information that the warrant's subjects were armed and dangerous and had readily available weapons). None of the officers who testified at the suppression hearing ever stated a belief that defendant, Hendricks, or Garcia posed a threat to officer safety or that defendant had committed any crime. It follows that, under the circumstances, the officers' handcuffing of defendant was an unconstitutional seizure.

█ However, suppression of defendant's statements does not invariably follow from that conclusion. Under Oregon law, suppression of unlawfully obtained evidence is remedial—its purpose is to restore the defendant to the same position as if the government had stayed within the law. *State v. Davis*, 295 Or 227, 233-34, 666 P2d 802 (1983). Accordingly, we must consider whether the evidence sought to be suppressed was obtained as a result of a violation of defendant's Article I, section 9, rights. *State v. Hall*, 339 Or 7, 24, 115 P3d 908 (2005). In doing so, we first determine whether a defendant has established a "minimal factual nexus" between the

unlawful stop and the evidence to be suppressed. *State v. Tyler*, 218 Or App 105, 110, 178 P3d 282 (2008). A nexus exists if there is a "but for" relationship between the unlawful stop and the evidence sought to be suppressed. *Id.*

■    As an initial matter, we conclude that defendant has established the necessary "but for" causation. Had defendant not been detained and handcuffed, the officers would not have been in a position to obtain his statements admitting to possession of the seized methamphetamine. *See State v. Rodgers*, 219 Or App 366, 374, 182 P3d 209, *rev allowed*, 345 Or 341 (2008) (the requisite causal nexus is established where, "but for the unlawful seizure, [police] would not have been in a position to request consent").

■ ■ Our inquiry does not end there. Instead, the burden shifts to the state to establish either that the evidence would have been obtained independently of the illegality or that the connection between the unlawful stop and the evidence is attenuated. If the state can establish independence, the evidence is not tainted and is admissible. If the state cannot establish independence, it must show attenuation. *Tyler*, 218 Or App at 110. Factors that the state may use for doing so include the lack of temporal proximity between the illegal action by the police and the discovery of the subsequent evidence, and the presence of intervening or mitigating circumstances. *State v. Wolfe*, 295 Or 567, 572, 669 P2d 320 (1983).

■    Here, the state contends that this case should be remanded for further factfinding regarding attenuation because, according to the state, the trial court "did not make any factual findings or conclusions of law with respect to whether, under the totality of [the] circumstances, [apprising defendant of his *Miranda* rights] provided a sufficient temporal break." We view the record differently. Although the trial court found that defendant had been lawfully detained, it also noted that defendant's conversation with Rappe occurred after defendant had been advised of his *Miranda* rights and explained that, in its view, the statements had been lawfully obtained. Thus, it appears that the trial court concluded that, even if defendant had been illegally stopped, the *Miranda* warnings attenuated the illegal stop.

■    We disagree with that conclusion. As we have recently noted, *Miranda* warnings do not function as a "universal solvent" that, with nothing more, break the causal chain. *State v. Ayles*, 220 Or App 606, 614, 188 P3d 378, *rev allowed*, 345 Or 460 (2008). Instead, the purported attenuating effect of *Miranda* must be assessed in the totality of the circumstances, including whether the defendant subsequently, and without police prompting, unilaterally volunteered the disputed evidence. *Id.* at 616. Under the circumstances at issue here, we cannot say that the warnings helped to attenuate the causal connection between the officers' illegal stop of defendant and his inculpatory statements. Although the state presented evidence that defendant inculpated himself after receiving *Miranda* warnings, the state failed to present evidence about whether those statements were spontaneous or prompted by police questioning. The passage of an hour between defendant being handcuffed—the illegal seizure—and his inculpatory statements is similarly unavailing because defendant remained in handcuffs throughout that period. Because the state did not demonstrate that defendant's statements were attenuated from the preceding unconstitutional stop, the trial court erred in denying defendant's motion to suppress his inculpatory statements.

Reversed and remanded.