Submitted July 28, 2009, reversed and remanded January 27, 2010

## STATE OF OREGON,
*Plaintiff-Respondent,*

*v.*

## NATASHA LARAE FAIR,
nka Natasha Larae Ortega,
*Defendant-Appellant.*

Deschutes County Circuit Court
06FE1759AB; A136985

225 P3d 848

Peter Gartlan, Chief Defender, Appellate Division, and Tammy W. Sun, Deputy Public Defender, filed the brief for appellant.

John R. Kroger, Attorney General, Erika L. Hadlock, Acting Solicitor General, and Susan G. Howe, Senior Assistant Attorney General, filed the brief for respondent.

Before Rosenblum, Presiding Judge, and Brewer, Chief Judge, and Riggs, Senior Judge.

BREWER, C. J.

## BREWER, C. J.

Defendant appeals a judgment of conviction on one count of unlawful possession of methamphetamine. ORS 475.894. Defendant asserts that the trial court erred in denying her motion to suppress evidence. After the court denied her suppression motion, defendant entered a conditional plea of guilty, reserving her right to challenge the denial of the suppression motion. For the reasons set forth below, we reverse and remand.

In reviewing a trial court's ruling on a suppression motion, we are bound by the court's findings of historical fact if there is evidence in the record to support them. *State v. Ehly*, 317 Or 66, 75, 854 P2d 421 (1993). Where findings are not made on all facts, and there is evidence from which those facts could be decided more than one way, we will presume that they were decided in a manner consistent with the trial court's ultimate conclusion. *Ball v. Gladden*, 250 Or 485, 487, 443 P2d 621 (1968). In the present case, the trial court indicated that it "adopt[ed] the testimony of the witnesses as its findings of fact" and ultimately concluded, as pertinent here, that "the police officer's initial contact with Defendant was not a stop." Accordingly, to the extent that there was conflicting evidence on any aspect of the encounter, we recite the version of facts most favorable to the state's position that no unlawful seizure occurred. As explained below, even from that vantage, we conclude that defendant had been unlawfully seized when the challenged evidence was discovered.

Lieutenant Utter and Deputy Mendoza were dispatched to defendant's residence to investigate a 9-1-1 call that had been placed from that address. The dispatcher had heard a female saying "stop it" and "get off me," and had heard a male voice yelling in the background before the connection was broken. The dispatcher had tried to call back but had received no answer.

Utter and Mendoza circled the house on foot. Mendoza looked through a sliding glass door in the back and observed an angry-looking man. Mendoza yelled for the man to come to the door and to keep his hands visible, but the man did not respond. Utter and Mendoza then returned to the

front of the property and knocked on the front door. Utter testified at the suppression hearing that, if there had been no response to their knocking on the door, the officers were prepared to force entry "to make sure that people were okay in the house." Defendant and her husband (whom Mendoza identified as the angry man) answered the door. Utter observed that defendant had a swelling over her right eye. Mendoza ordered both defendant and her husband to come outside, and they complied. Mendoza handcuffed defendant's husband and took him to the other end of the front porch, approximately 20 feet away.

Utter instructed defendant to stay where she was, on the porch near the door to the home, and then began questioning defendant about the 9-1-1 call. At first, she denied making the call, and then she stated that she had made the call accidentally. She acknowledged that she and her husband had been arguing. Utter asked for defendant's identification and, when she stated that she did not have it with her, he asked for her name and date of birth. Using his hand-held radio, Utter requested a warrant check on defendant. When the dispatcher reported no warrants and no driving record, Utter requested defendant's maiden name and had the dispatcher run a check under that name as well, again resulting in no warrants and no driving record. Utter then asked if defendant had ever had a driver's license, and she responded that she had not. At that point, Utter asked defendant if she had ever been arrested. When she replied that she had, he asked what she had been arrested for, and defendant responded that she had been arrested for possession of drugs.

Utter resumed questioning defendant about the situation with her husband, asking her about the mark above her eye. Defendant told him that the mark had accidentally been inflicted while she was moving furniture. At that point, Utter observed an orange plastic syringe cap fall out of defendant's pants leg onto the floor of the porch. After inquiring whether anyone in the household was insulin-dependent and receiving a negative response, Utter asked defendant if anyone in the house was an intravenous drug user. Defendant did not respond, and Utter then asked her when she had last used drugs. Defendant asked why Utter was inquiring, and

Utter told her he had noticed the syringe cap. At that point, defendant asked Utter not to tell her husband about it. On further questioning, defendant acknowledged that she had injected methamphetamine several weeks earlier. Utter sought and received consent to search defendant's person, at which point he found a broken glass pipe with drug residue. Utter then placed defendant under arrest.

Utter testified at the suppression hearing that, when defendant was ordered from the house and told to remain where she was, he was investigating a possible domestic assault by defendant's husband against defendant. Utter testified that he did not suspect defendant of any crime and acknowledged that, after his initial contact with defendant, had defendant

> "told me that she was not going to talk to me any further and that she was not going to provide me with any information, barring any additional evidence that I could utilize to verify that in fact she had been the victim of a crime, I would not have been able to stop her from walking in the house and closing the door on me essentially."

Utter did not, however, indicate to defendant that she was free to leave. Utter further testified that nothing in the encounter with defendant raised any safety concerns.

■        The trial court denied defendant's motion to suppress, stating the following legal conclusions:

> "The police officer's initial contact with Defendant was not a stop. After the officer observed an orange cap from a syringe fall from Defendant's pant leg, the officer had reasonable suspicion to believe Defendant was in possession of controlled substances or drug paraphernalia. The officer asked Defendant for consent to search her for drugs. Defendant verbally consented without placing restrictions on the scope of search."

On appeal, defendant argues that the trial court erred in denying her motion to suppress.

In *State v. Holmes*, 311 Or 400, 409-10, 813 P2d 28 (1991), the court stated that, for purposes of Article I, section 9, a seizure of a person occurs

"(a) if a law enforcement officer intentionally and significantly restricts, interferes with, or otherwise deprives an individual of that individual's liberty or freedom of movement; or (b) whenever an individual believes that (a), above, has occurred and such belief is objectively reasonable in the circumstances."

In particular, defendant posits that she was seized when the officer instructed her to come out of the house onto the porch and remain where she was, or alternatively, that she was seized when Utter ran a warrant check on defendant and began questioning her about her criminal history. As explained below, we agree with defendant that she was seized when she was ordered to come out of the house and remain on the porch.

The state responds that the trial court correctly concluded that defendant was not seized before Utter saw the syringe cap. Relying on ORS 131.615(5) (an officer "making a stop may use the degree of force reasonably necessary to make the stop and ensure the safety of the peace officer, the person stopped or other persons who are present"), the state argues that the detention of defendant's husband was justified, and it therefore follows that it was "reasonably necessary" for Utter to order defendant to remain where she was so that her husband could be safely taken into custody. The state contends:

"Common sense alone dictates that a police officer would be authorized to physically separate a suspect from an associate before handcuffing the suspect, in order to minimize any of the following possibilities: (1) the suspect would assault either the officer or his/her associate; (2) the suspect would encourage the associate to assist resisting his/her arrest; (3) the associate would assault either the suspect or the officer; (4) the suspect would resist arrest and either the officer or the suspect's associate would be injured as a result of the suspect's actions, etc."

The state relies on this court's decisions in *State v. Hitchcock*, 224 Or App 77, 197 P3d 33 (2008), and *State v. Barnett*, 132 Or App 520, 888 P2d 1064, *rev den*, 321 Or 137 (1995), in support of that thesis. However, "common sense alone" is not the legal test to be applied in this situation. In

*Hitchcock*, the defendants were present in a house when officers received consent from a homeowner to enter the house to arrest a wanted individual. While making a protective sweep of the home, an officer handcuffed one of the defendants, Hitchcock. We stated that "[w]e *assume* that the initial detention of [the defendants] was justified for officer safety reasons." 224 Or App at 85 (emphasis added). But we noted specifically that we were not called on to address the question whether the initial protective sweep and the detention were "justified on the basis of officer safety." *Id.* at 83 n 2. Although we assumed in *Hitchcock* that officer safety concerns justified the detention, we did *not* suggest that officers generally can detain people while they are executing a warrant, investigating a crime, or pursuing a suspect, based on unspecified "officer safety" grounds. And, in fact, our case law specifically holds otherwise.

In *Barnett*, on which the state also relies, the defendant was present at a home where a search warrant was being executed. The officers handcuffed and frisked the defendant and others present as soon as the officers entered the living room. 132 Or App at 522. In determining that the handcuffing and frisk were reasonable under the circumstances, we applied the familiar principle enunciated in *State v. Bates*, 304 Or 519, 524, 747 P2d 991 (1987), that steps taken by officers to protect themselves and others during a lawful encounter must be "based on specific and articulable facts that the citizen might pose an immediate threat of serious physical injury to the officer or to others then present." In *Barnett*, the officers had information that the homeowner was armed and that guns were "readily available" inside the home. 132 Or App at 522. Thus, we concluded that the handcuffing of the defendant was a "seizure" under Article I, section 9, but that it was nonetheless justified as a "reasonable safety measure." *Id.*

More recently, in *State v. Hawkins*, 225 Or App 355, 201 P3d 239 (2009), we reiterated that point. In *Hawkins*, as in *Barnett*, officers executed a warranted search in a house where the defendant was present. The officers handcuffed the defendant and detained him while the warrant was executed. In *Hawkins*, unlike in *Barnett*, the officers had no

information indicating that anyone inside the house presented a threat; they were searching for evidence of forgery. We stated:

> "When officers execute a search warrant and have reason to believe that at least some of the persons present are armed and dangerous, officer safety concerns permit officers to handcuff and detain all persons who are present, even persons not named in the warrant. *State v. Swibies*, 183 Or App 460, 467, 53 P3d 447 (2002). Conversely, if officers do not have reason to believe that persons present are armed or otherwise dangerous, something more specific must be shown before officers may handcuff persons whom they find while executing the warrant. *Id.* at 467-68. In this case, nothing in the record suggests that the officers possessed information that Garcia or his mother, let alone defendant, was armed or dangerous. *Cf. State v. Barnett*, 132 Or App 520, 524, 888 P2d 1064, *rev den*, 321 Or 137 (1995) (officers could handcuff a defendant who was not a subject of a warrant because the officers had information that the warrant's subjects were armed and dangerous and had readily available weapons). None of the officers who testified at the suppression hearing ever stated a belief that defendant, Hendricks, or Garcia posed a threat to officer safety or that defendant had committed any crime. It follows that, under the circumstances, the officers' handcuffing of defendant was an unconstitutional seizure."

225 Or App at 363.

In this case, the state made no record below and makes no argument on appeal that specific and articulable facts supported the detention of defendant for safety purposes while her husband was being investigated. Rather, as noted above, Utter testified that he did *not* have safety concerns that justified his detention of defendant and that, had she insisted, he recognized that he would have had to let her return to the house. We reject the state's suggestion that generalized safety concerns authorized the officer to order defendant, a potential crime victim, from her home and detain her outside under circumstances such as these.

The state next suggests that any detention of defendant before Utter observed the syringe cap was "reasonable and insignificant because defendant *herself* had requested

emergency response by calling 9-1-1." (Emphasis in original.) The state posits that our case law establishes that "an officer does not unreasonably seize a person under Article I, section 9, when the officer contacts a person who has called 9-1-1 because the person 'created the impression that she had information to disclose to [the officer].' " *State v. McFarland*, 210 Or App 744, 750, 152 P3d 967 (2007). We disagree that *McFarland* stands for such a broad proposition.

In *McFarland*, an officer was dispatched to investigate a report of a dispute in a particular area but was not given a specific address. When he reached the area, the officer observed the defendant driving toward him. When the defendant saw the officer, she pointed to a house. Through an open car window, the officer asked the defendant if the dispute was occurring in that house and if she had called 9-1-1. She replied that she had. The officer then told defendant to pull over. She complied, and the officer subsequently observed evidence of driving under the influence of intoxicants. Relying on *Holmes* and *State v. Gerrish*, 311 Or 506, 815 P2d 1244 (1991), we concluded that no unconstitutional seizure had occurred. We began by quoting *Holmes*:

> "An important consideration in differentiating between an encounter and a seizure is that
>
>> " 'law enforcement officers remain free to approach persons on the street or in public places, seek their cooperation or assistance, request or impart information, or question them without being called upon to articulate a certain level of suspicion in justification if a particular encounter proves fruitful.' "

*McFarland*, 210 Or App at 748 (quoting *Holmes*, 311 Or at 410). In *McFarland*, as in *Holmes* and *Gerrish*, the encounters occurred on public streets and involved officers flagging down motorists. In *Holmes*, an officer briefly detained a motorist to explain that, because of an accident ahead, vehicles were being rerouted. 311 Or at 402-03. In *Gerrish*, an officer briefly stopped all vehicles in the area where a robbery had occurred, seeking witnesses or the perpetrators. The court there concluded that no seizure had occurred, because the officer merely intended a brief exchange of information

and a reasonable motorist would not, under the circumstances, believe that his or her liberty had been significantly restricted. 311 Or at 512-13. In *McFarland*, we concluded that *Holmes* and *Gerrish* were controlling, and we further noted that, because the "[d]efendant requested police contact by calling 9-1-1 *and then initiated the first contact with the officer* regarding the call by pointing to the house on the corner," the defendant did not have a reasonable belief that she had been unlawfully seized when the officer sought additional information. 210 Or App at 749-50 (emphasis added).

To explain why this case is *not* like *McFarland* (or *Holmes* or *Gerrish*, for that matter), we return to a basic premise of *Holmes*. The court stated in *Holmes* that "a police-citizen encounter without any restraint of liberty (*e.g.*, mere conversation, a non-coercive encounter) is not a 'seizure' and, therefore, requires no justification." 311 Or at 407. In describing its "mere conversation" jurisprudence, the court stated that "law enforcement officers may approach persons on the street or in public places, question them, and even accompany them to another location without the encounter necessarily constituting a 'seizure' * * *." *Id.* at 409. The court explained:

> "Under these 'seizure' standards, law enforcement officers remain free to approach persons on the street or in public places, seek their cooperation or assistance, request or impart information, or question them without being called upon to articulate a certain level of suspicion in justification if a particular encounter proves fruitful. A street or public place encounter does not amount to an Article I, section 9 'seizure' merely because the encounter may involve inconvenience or annoyance for the citizen and the other party to the encounter is known to be a law enforcement officer. Even physical contact does not transform the encounter into a 'seizure' if it is a normal means of attracting a person's attention (*e.g.*, policeman tapping citizen on the shoulder at the outset to get a citizen's attention). *See* LaFave, 3 Search and Seizure, A Treatise on the Fourth Amendment 413, § 9.2(h) (2d ed 1987). Rather, the encounter is a 'seizure' of a person only if the officer engages in conduct significantly beyond that accepted in ordinary social intercourse. The pivotal factor is whether the officer, even if making inquiries a private citizen would not, has otherwise

conducted himself in a manner that would be perceived as a nonoffensive contact if it had occurred between two ordinary citizens."

*Id.* at 410.

■ In sum, the test for determining whether a contact exceeded mere conversation is whether the officer engaged "in conduct significantly beyond that accepted in ordinary social intercourse." *Id.* The "mere encounters" in *Holmes* and the cases underlying it occurred in streets or other public places. There is a significant difference between the typical circumstances of a police officer approaching a person on a public street—for example, by flagging down a motorist in order to conduct a brief exchange of information, as was the case in *Holmes, Gerrish,* and *McFarland*—and a police officer going to the door of a person's home, ordering the person out of the home, and instructing the person to remain with the police officer, which is what occurred in this case.[1]

In *State v. Dahl*, 323 Or 199, 206, 915 P2d 979 (1996), the court readily concluded that an officer's actions in ordering a defendant to "come out of this house with his hands up" was a seizure. There, the court reiterated that a seizure occurs when an officer " 'engages in conduct significantly beyond that accepted in ordinary social intercourse.' " *Id.* at 207 (quoting *Holmes,* 311 Or at 410). The court in *Dahl* concluded:

"We need not decide the precise moment at which defendant was seized. It is sufficient to state that he had been seized while in the house, before he came out of his house with his hands up in response to the police order. The police order to defendant was not a request. Rather, it conveyed a message that compliance was required. The order was

---

[1] Our conclusions here are based on a fact-specific inquiry into the totality of the circumstances. We emphasize that we are *not* suggesting that any one fact is dispositive or that officers may never issue directives to suspected crime victims without unlawfully seizing them. For example, depending on the circumstances, and unlike in this case, an officer's decision to order a suspected crime victim to come out of a house might be supported by a record that the officer had a reasonable belief that something or someone in the house posed an immediate threat of danger to the suspected crime victim. Or, for example, if the state made the necessary record to establish that a suspected crime victim was about to interfere with an officer's apprehension of the suspect, a stop pursuant to ORS 131.615 (a *Terry* stop) could be justified.

intended to and did result in a significant restriction of defendant's liberty or freedom of movement. * * * The police had, in effect, announced to defendant that (1) he was not at liberty to go about his business and ignore their order to come out of his house 'with his hands up,' and (2) he did not have the right to refuse to comply with that order."

*Id.* at 207.

Although it is true that, in this case, defendant was not ordered to come out with her hands up, she nonetheless was ordered—not requested—to come out of her house and was told to remain outside with the officer while an investigation occurred. The officer's directive in this case, like the directive in *Dahl*, "was intended to and did result in a significant restriction of defendant's liberty or freedom of movement." *Id.* In terms of the *Holmes* taxonomy, this case presents a type (a) seizure, where "a law enforcement officer intentionally and significantly restricts, interferes with, or otherwise deprives an individual of that individual's liberty or freedom of movement[.]" *Holmes*, 311 Or at 409-10. It follows that, because defendant had been unlawfully seized before Utter observed the syringe cap and the additional evidence that followed that observation, the trial court erred in denying defendant's motion to suppress evidence.[2]

Reversed and remanded.

---

[2] The state makes no argument in the present case that even if defendant was unlawfully stopped,the discovery of the evidence was otherwise inevitable or sufficiently attenuated from the unlawful police conduct under the analysis of *State v. Hall*, 339 Or 7, 25, 115 P3d 908 (2005).